748 A.2d 558

LAWRENCE WATKINS, JR., PLAINTIFF–APPELLANT,
v. BEVERLY NELSON AND KEVIN M. NELSON,
DEFENDANTS–RESPONDENTS.

Argued January 18, 2000—Decided April 6, 2000.

*Joel C. Seltzer,* argued the cause for appellant.

*JoAnne Byrnes,* argued the cause for respondents.

The opinion of the Court was delivered by

COLEMAN, J.

This is an action for custody of a three and one-half year-old child who has been residing with the maternal grandparents since the sudden death of the mother twelve days after giving birth to the child. This appeal requires us to determine the appropriate standard for deciding a custody dispute between a biological parent and a third party following the death of the custodial parent. Specifically, we must determine whether it was appropriate for the lower courts to consider the best interests of the child as the appropriate standard in awarding custody of a fit biological father's child to the deceased mother's parents. Approximately nineteen months after the mother's tragic death, the Chancery Division, Family Part, determined that it was in the child's best interest to award custody to the maternal grandparents. In a published opinion, a divided appellate panel affirmed. 321 *N.J.Super.* 482, 729 *A.*2d 484 (App.Div.1999). This appeal is before the Court as of right by reason of the dissent. We now reverse.

 We hold that the courts below applied the improper standard to this custody dispute. Upon the death of the custodial parent, in an action for guardianship of a child pursuant to *N.J.S.A.* 9:2–5, a presumption exists in favor of the surviving biological parent. That presumption can be rebutted by proof of gross misconduct, abandonment, unfitness, or the existence of "exceptional circumstances," but never by a simple application of the best interests test. Because that presumption in favor of the biological father has not been rebutted, and because of the need

for finality to these proceedings, we direct the immediate transfer of custody to the biological father, plaintiff Lawrence Watkins. Consistent with the biological father's concession to this Court that the Nelsons should have visitation with the child, we direct the trial court to establish a visitation schedule for Beverly and Kevin Nelson, the maternal grandparents.

## I.

The facts critical to this litigation unfolded quickly and are largely undisputed. On August 15, 1996, seventeen year-old Megan Murphy (Megan) gave birth to Chantel Ivonne Watkins–Murphy (Chantel). Nineteen year-old plaintiff Lawrence Watkins (Larry) executed a Certificate of Parentage at the hospital shortly after Chantel's birth, legally establishing paternity. *See N.J.S.A.* 9:17–41b. Megan and Larry were not married; nor did they live together. Chantel and Megan resided at the home of Megan's mother and stepfather, defendants Beverly and Kevin Nelson. Larry lives with his parents, a sister, and an uncle about an hour's drive from the Nelsons' home. Larry and Megan continued to see each other after Chantel was born, and Larry testified that they had planned to get married. On August 27, 1996, twelve days after Chantel was born, Megan died in an automobile accident. Although Chantel was riding in the vehicle with her mother, it appears that she emerged without permanent physical harm.

At Megan's funeral, Beverly Nelson was informed that Larry wanted custody of Chantel, but Ms. Nelson refused to give the child to the father. Throughout the ensuing litigation, Chantel has lived with the Nelsons, spending most of her weekends with Larry and his family. On September 4, 1996, the Nelsons filed a verified complaint seeking to be appointed as guardians for Chantel, presumably pursuant to *N.J.S.A.* 9:2–5. Notwithstanding the fact that Larry had executed the Certificate of Parentage before Chantel left the hospital, and that Megan herself acknowledged Larry as the father on the child's birth certificate, the Nelsons alleged in the guardianship complaint that "[d]oubt exists with

respect to the infant's paternity." Ms. Nelson's certification, attached to the verified complaint, stated: "Lawrence Watkins is of African–American descent. My daughter, Megan Murphy, was of Hispanic and European descent. . . . Chantel does not presently appear to have typical African–American characteristics." The Nelsons also sought an order compelling Larry to submit to genetic testing. Within two days after the complaint was filed, Larry filed a certification in opposition to the complaint in which he represented that he is the biological father of Chantel. He asserted that since Megan's funeral, Ms. Nelson had deprived him of custody of Chantel, as well as Chantel's love, affection, and companionship. Ms. Nelson admitted in her certification that "[a]t my daughter's funeral, Lawrence Watkins expressed a desire to take Chantel into his household and his mother expressed her willingness to cooperate in this endeavor."

On October 8, 1996, a judge sitting in Hunterdon County, Chancery Division, Probate Part, entered a judgment granting temporary guardianship of Chantel to the Nelsons "pending the outcome of a custody determination in the Family Part." At the same time, the court denied the application for genetic testing of Larry because a Certificate of Parentage had been filed. As a result of that guardianship decision, Larry filed a more complete answer to the guardianship complaint in which he sought a dismissal of the request for guardianship. He also filed a counterclaim in which he sought, among other things, "permanent" custody of Chantel.

A temporary custody hearing was conducted before a hearing officer on April 4, 1997. When attempts to mediate the custody dispute failed, the matter was transferred from the Probate Part to the Family Part. On May 9, 1997, a Family Part judge ordered the parties "to attend the Hunterdon County custody/visitation mediation program in order to address the issue of custody." When Larry failed to attend, the same judge found Larry had violated the court's order and directed all counsel to submit briefs

concerning custody and all other issues to be resolved at a plenary hearing.

Although no formal court order was ever entered regarding visits by Larry with Chantel, the parties voluntarily agreed that he would have weekend visitation at his home. On December 16, 1997, the visitation schedule was expanded to include Friday evenings.

Chantel was sixteen months old when the plenary trial was conducted. The parties presented testimony over a four-day period. In support of Larry's request for custody, he testified, along with his parents and sister. All asserted that Larry loves Chantel, that Chantel recognizes Larry as her father, and that Larry would be a competent parent. The Nelsons testified that they too love Chantel and that Ms. Nelson has taken on the parental responsibilities since Megan's death. Although Ms. Nelson questioned Larry's maturity and paternity, the Nelsons never alleged that Larry was in any way unfit to raise Chantel. The Nelsons' position was simply that they could do a better job parenting, and that was in Chantel's best interests.

Larry also testified that he is aware that Chantel has a neurological problem related to overly flexible joints. He acknowledged that he has reviewed a medical notebook outlining exercises for the child and that he has been reading to her and helping her perform activities designed to enhance Chantel's motor skills.

Dr. Robert Clyman, a clinical psychologist, appeared on behalf of the Nelsons. He testified that he evaluated the Nelsons "in order to offer a recommendation as to whether they could be suitable ... custodial candidates for Chantel." Dr. Clyman opined that Mrs. Nelson "has excellent parenting skills," and that Chantel was fully integrated into the Nelson family. Dr. Clyman did not evaluate Larry or the Watkins family.

Chantel was nineteen months old when the trial court rendered its decision on March 11, 1998. The trial court recognized that "in a custody dispute between a biological parent and a third person,

the parent-child relationship is ordinarily not disturbed unless there is a clear showing of the parent's gross misconduct or unfitness." The trial court then noted that "[i]n this case, Beverly and Kevin Nelson stand in the shoes of their deceased daughter Megan and are in parity with Lawrence Watkins Jr., thus, the best interest standard should apply." After weighing the relevant factors, the court concluded that it was in Chantel's best interests to award custody to the Nelsons. The court was concerned with Larry's level of maturity, and was convinced that "Chantel's physical and mental welfare will be better protected in the Nelson household." The court awarded custody to the Nelsons and directed that the then current visitation schedule remain in effect.

Larry appealed that determination, and while the appeal was pending, the Nelsons filed yet another application with the trial court to compel Larry to undergo genetic testing, notwithstanding the trial court's previous denial of the identical application. The second application was similarly denied by the trial court on July 17, 1998. Six months later, the appeal was argued before the Appellate Division and decided on May 28, 1999.

A divided appellate panel affirmed in separate opinions, "substantially for the reasons set forth in [the trial court's] opinion." 321 *N.J.Super.* at 484, 729 *A.*2d 484. The majority stressed that " 'unfitness' is not the issue here." *Id.* at 495, 729 *A.*2d 484. Thus, "[w]e will not interfere with the trial judge's perceptions and conclusions that as between the Nelsons and Watkins, Chantel's best interest will be served by continuing primary custody with the Nelsons, with substantial parenting time for Watkins." *Id.* at 498, 729 *A.*2d 484. The concurring opinion noted that in a custody dispute between a biological parent and a third party, *N.J.S.A.* 9:2–5 bestows a "presumption favoring the surviving parent." *Id.* at 501, 729 *A.*2d 484 (Landau, J., concurring). However, to overcome that presumption, "the appropriate legislative standard set for judicial inquiry is the best interests, i.e., 'benefit' of the children as required in the circumstances." *Ibid.*

One member of the panel filed a dissenting opinion in which he argued persuasively that the trial court abused its discretion in finding that the Nelsons' right to custody of Chantel was in parity with Larry's. Instead, according to the dissent, the appropriate standard is the one used when terminating parental rights, *id.* at 504, 729 *A.*2d 484, and that to obtain custody, the Nelsons should have been required to prove that Larry is an unfit parent. *Id.* at 502, 729 *A.*2d 484 (Braithwaite, J., dissenting). The dissent concluded that because no evidence of parental unfitness was presented, custody should have been awarded to Larry. *Id.* at 501–02, 729 *A.*2d 484. Judge Braithwaite summarized his analysis in the following manner:

Considering that Chantel was only sixteen months old at the commencement of the trial, that plaintiff always held himself out to the child as her natural father, and that no evidence was presented that the child would be harmed by the change in custody, the reasons advanced by the trial judge and affirmed by my colleagues are wholly inadequate to conclude that the Nelsons are Chantel's psychological parents.

[*Id.* at 503, 729 *A.*2d 484].

## II.

This appeal is before the Court as of right. *R.* 2:2–1(a). The natural father argues that the Appellate Division erred in applying the child's best interests standard to this case and, in so doing, deprived him of his constitutional and statutory rights to custody of his child. The Nelsons contend that this is an appropriate case in which to apply the child's best interests standard, and that a natural parent's constitutional and statutory rights are triggered only in cases involving termination of parental rights. They maintain that because Larry's parental rights have not been terminated, there was no constitutional or statutory violation. We reject the Nelsons' contentions.

## A.

We begin our analysis with the statute under which the guardianship complaint was filed, *N.J.S.A.* 9:2–5. That statute provides:

In case of the death of the parent to whom the care and custody of the minor children shall have been awarded by the Superior Court, or in the case of the death of the parent in whose custody the children actually are, when the parents have been living separate and no award as to the custody of such children has been made, the care and custody of such minor children shall not revert to the surviving parent without an order or judgment of the Superior Court to that effect. The Superior Court shall have the right, in an action brought by a guardian ad litem on behalf of the children, to appoint such friend or other suitable person, guardian of such minor children, and shall have the right to remove such guardian, and to appoint a new guardian or guardians, and to make such judgments and orders, from time to time, as the circumstances of the case and the benefit of the children shall require.

[*N.J.S.A.* 9:2–5].

The statute does not require prior court approval for a voluntary transfer of custody by a custodial caregiver to a previously non-custodial parent upon the death of the custodial parent. However, the Superior Court can order such a transfer. But before ordering such a transfer under the statutory scheme, the Superior Court must make the disputed custody determination and, if necessary, appoint a guardian until that determination can be made. Whereas *N.J.S.A.* 9:2–5 precludes the surviving non-custodial parent's automatic accession to custody of his or her child, the statute does not concomitantly enhance the status of those who temporarily take custody upon the death of the custodial parent. *Todd v. Sheridan,* 268 *N.J.Super.* 387, 397–98, 633 *A.*2d 1009 (App.Div.1993). Moreover, *N.J.S.A.* 9:2–5 does not contain a standard to be applied when deciding a custody dispute. The second sentence in the statute confers upon the Superior Court the power, "in an action brought by a guardian ad litem on behalf of the children," to appoint and remove guardians, and to make "such judgments and orders, from time to time, as the circumstances of the case and the benefit of the children shall require." *N.J.S.A.* 9:2–5.

When the statute is read in the proper context, we conclude that the quoted phrase refers to the time period between the death of the custodial parent and the ultimate transfer of custody. We also conclude that the statute does not authorize a court to use the child's "best interests" test as the primary standard when making

the ultimate custody determination in a custody dispute between a parent and a third party. Because the statute does not provide a standard, we must look to our statutory and decisional law concerning custody to decipher the appropriate standard to be applied in this case.

### B.

A review of the statutory and common law of custody disputes convinces us that in an action between a parent and a third party, a presumption of custody exists in favor of the parent. New Jersey's comprehensive custody-statutory scheme proclaims that "it is in the public policy of this State to assure minor children of frequent and continuing contact with both parents." *N.J.S.A.* 9:2–4. Furthermore, in any custody dispute, "the rights of both parents shall be equal." *Ibid.* Similarly, *N.J.S.A.* 9:17–40 declares that "[t]he parent and child relationship extends equally to every child and to every parent, regardless of the marital status of the parents." A "'parent,' when not otherwise described by the context, means a natural parent or parent by previous adoption." *N.J.S.A.* 9:2–13(f). Grandparents are neither natural nor adoptive parents under the statute.

*N.J.S.A.* 9:2–4 refers only to parents and does not refer to third parties. However, *N.J.S.A.* 9:2–9 instructs that if a parent is "grossly immoral or unfit[,] ... *any person* interested in the welfare of such child" may institute an action in Superior Court. (Emphasis added). *N.J.S.A.* 9:2–10 then allows a court, in an action brought by a third party pursuant to *N.J.S.A.* 9:2–9, to award custody of the child to that third party. But such a custodial award is based on a finding of parental unfitness, which was never alleged or found to exist in the present case. When read together, those statutory provisions indicate that in a custody dispute between a parent and a third party, the public policy of this State is that a presumption exists in favor of the parent. A third party can overcome that presumption by satisfying the standard required for termination of the rights of a non-consent-

ing parent: unfitness, abandonment, gross misconduct, or "exceptional circumstances."

A reading of the statutory scheme to generally afford a fit parent a superior right to the custody of his or her child as against third parties conforms to common sense and constitutional law. That idea is " 'so rooted in the tradition and conscience of our people as to be ranked as fundamental.' " *Griswold v. Connecticut,* 381 *U.S.* 479, 487, 85 *S.Ct.* 1678, 1683, 14 *L. Ed.*2d 510, 517 (1965) (Goldberg, J., concurring) (citation omitted). The Supreme Court of the United States noted long ago that "[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents." *Prince v. Massachusetts,* 321 *U.S.* 158, 166, 64 *S.Ct.* 438, 442, 88 *L.Ed.* 645 (1944); *see also Santosky v. Kramer,* 455 *U.S.* 745, 753, 102 *S.Ct.* 1388, 1394–95, 71 *L.Ed.*2d 599 (1982). Similarly, in *In re Baby M,* 109 *N.J.* 396, 537 *A.*2d 1227 (1988), this Court recognized that a parent has a constitutionally protected, albeit limited, fundamental right to the companionship of his or her child. *Id.* at 450, 452 n. 16, 537 *A.*2d 1227; *see also Adoption of Children by G.P.B.,* 161 *N.J.* 396, 403, 736 *A.*2d 1277 (1999). Judge Michels best summarized the law when he wrote:

Indeed, the right of natural parents to the custody, care and nurturing of their children has risen to the stature of a fundamental right and deserves special protection. *Santosky v. Kramer,* 455 *U.S.* 745, 753, 102 *S.Ct.* 1388, 1394, 71 *L. Ed.*2d 599 (1982); *Stanley v. Illinois,* 405 *U.S.* 645, 651–652, 92 *S.Ct.* 1208, 1212–1213, 31 *L. Ed.*2d 551 (1972) (and cases cited); *In re Guardianship of Dotson,* 72 *N.J.* 112, 122, 367 *A.*2d 1160 (1976) (Pashman, J., concurring); *State v. Perricone,* 37 *N.J.* 463, 472, 181 *A.*2d 751 (1962), *cert. den.,* 371 *U.S.* 890, 83 *S.Ct.* 189, 9 *L. Ed.*2d 124 (1962). *See In re N.,* 96 *N.J.Super.* 415, 424–425 n. 5, 233 *A.*2d 188 (App.Div.1967). Since the right of parents to the custody of their minor children is both a natural and legal right, the law should not disturb the parent/child relationship except for the strongest reasons and only upon a clear showing of a parent's gross misconduct or unfitness or of other extraordinary circumstances affecting the welfare of the child. *See* 59 *Am. Jr.* 2 nd, *Parent and Child,* § 25 at 107–108 (1971). Thus, in determining a child's best interest, courts traditionally have been reluctant to deny a natural parent custody of his or her own child. *In re Mrs. M., supra,* 74 *N.J.Super.* at 183–184, 181 *A.*2d 14. *See E.T. v. L.P., supra,* 185 *N.J.Super.* at 84, 447 *A.*2d 572; *Hoy v. Willis,* 165 *N.J.Super.* at 272, 398 *A.*2d 109; *In re N., supra,* 96 *N.J.Super.* at 423–24, 233 *A.*2d 188.

[*In re D.T.,* 200 *N.J.Super.* 171, 176–77, 491 *A.*2d 7 (App.Div.1985) ].

Not surprisingly, the concept that a presumption of custody exists in favor of a parent, and that only a showing of unfitness, abandonment, gross misconduct, or "exceptional circumstances" will overcome this presumption, is steeped in the history and common law of this State. *See, e.g., In re D.T., supra,* 200 *N.J.Super.* at 175–76, 491 *A.*2d 7; *E.T. v. L.P.,* 185 *N.J.Super.* 77, 84, 447 *A.*2d 572 (App.Div.1982); *S. v. H.M. & E.M.,* 111 *N.J.Super.* 553, 558–59, 270 *A.*2d 48 (App.Div.1970); *Kridel v. Kridel,* 85 *N.J.Super.* 478, 489, 205 *A.*2d 316 (App.Div.1964); *In re Mrs. M.,* 74 *N.J.Super.* 178, 183–84, 186, 181 *A.*2d 14 (App.Div.1962); *In re Adoption of B. by E. & R.,* 152 *N.J.Super.* 546, 551, 378 *A.*2d 90 (Union County Ct.1977); *Jacobson v. Jacobson,* 146 *N.J.Super.* 491, 497, 370 *A.*2d 65 (Ch.Div.1976); *Ex parte Alsdorf,* 142 *N.J. Eq.* 246, 252–53, 59 *A.*2d 610 (Ch.1948); *Gardner v. Hall,* 132 *N.J. Eq.* 64, 78, 26 *A.*2d 799 (Ch.1942), *aff'd* 133 *N.J. Eq.* 287, 31 *A.*2d 805 (E. & A.1943); *Pope v. Brown,* 3 *N.J. Misc.* 572, 572–73, 128 *A.* 851 (Ch.1925); *Hesselman v. Haas,* 71 *N.J. Eq.* 689, 694, 64 *A.* 165 (Ch.1906).

The principle that a showing of gross misconduct, unfitness, neglect, or "exceptional circumstances" affecting the welfare of the child will overcome this presumption, is a recognition that a parent's right to custody is not absolute. That parental right must, at times, give way to the State's *parens patriae* obligation to ensure that children will be properly protected from serious physical or psychological harm. *In re Guardianship of K.H.O.,* 161 *N.J.* 337, 347, 736 *A.*2d 1246 (1999); *In re Guardianship of J.C.,* 129 *N.J.* 1, 10, 608 *A.*2d 1312 (1992). This has been our law for more than a century. As early as 1889, the highest Court in this State allowed the presumption in favor of a natural parent to be overcome by a showing of "exceptional circumstances." *Richards v. Collins,* 45 *N.J. Eq.* 283, 17 *A.* 831 (E. & A. 1889). More recently, in *Sorentino v. Family & Children's Soc. of Elizabeth,* 72 *N.J.* 127, 131–132, 367 *A.*2d 1168 (1976), *appeal after remand,* 74 *N.J.* 313, 378 *A.*2d 18 (1977), the Court acknowledged that even if parental rights cannot be terminated on statutory grounds, "exceptional circumstances" based on the probability of serious psy-

chological harm to the child may deprive a parent of custody. *Ibid.* *Sees v. Baber,* 74 *N.J.* 201, 221–22, 377 *A.*2d 628 (1977), recognized the same principle.

*Sorentino* observed that the rights and interests of third parties, such as prospective adoptive parents, "are necessarily subordinate to the rights of the natural parents." 72 *N.J.* at 131, 367 *A.*2d 1168. The Court recognized that in certain anomalous cases the presumption in favor of the parent may be rebutted, even in the absence of gross misconduct, unfitness or abandonment, if a change in custody will cause serious psychological harm to a child. *Sorentino, supra,* 72 *N.J.* at 131–32, 367 *A.*2d 1168. The *Sorentino* "exceptional circumstance[s]" basis for rebutting the presumption in favor of a natural parent was grounded in the Court's power of *parens patriae,* to protect minor children from serious physical or psychological harm.

One year later we elaborated on the *Sorentino*-type of "exceptional circumstances." *Sees, supra,* 74 *N.J.* at 221–22, 377 *A.*2d 628. Unlike in *Sorentino,* the Court in *Sees* refused to override the presumption in favor of a parent, noting that because of the very young age of the child, proof of potential severe psychological harm from a change in custody would be impossible to establish. *Ibid.* Significantly, we noted that the natural parents were "complete strangers" to the child in *Sorentino,* unlike the relationships in *Sees. Id.* at 221, 377 *A.*2d 628. The Court concluded that absent proof of parental unfitness or "exceptional circumstances," "there is no statutory or legal basis upon which to deny or resist plaintiff's claim *qua* parent to the full custody of her child." *Ibid.*

The lesson to be learned from *Sorentino* and *Sees* is that they fall under the "exceptional circumstances" prong of the State's *parens patriae* doctrine, an alternative basis for overcoming the presumption in favor of parents. We reemphasize that the rationale for allowing parental unfitness or "exceptional circumstances" to rebut the presumption in favor of a parent is grounded in the Court's power of *parens patriae* to protect minor children from serious physical or psychological harm. The "exceptional circum-

stances" exception may rebut the presumption in favor of a parent seeking custody even if he or she is deemed to be a fit parent. A good illustration of such a case is *In re Marriage of Allen*, 28 *Wash.App.* 637, 626 *P.2d* 16, 23–24 (1981). There, the court held that awarding custody of a deaf, learning disabled child to a fit natural father who did not know sign language rather than to the stepmother, who knew sign language, would cause substantial harm to the child, who had resided with three siblings and the stepmother for four years. *Ibid.* Justice Stein in his dissent has characterized our intended scope of the "exceptional circumstances" standard much too narrowly. We do not intend to restrict that standard solely to the *Sorentino*-type cases or unfit parents.

Suffice it to say, "exceptional circumstances" mean more than a child's best interests and include, but are not limited to, the *Sorentino*-type of psychological parenthood. A significant difference between the child's best interests test and the parental termination or "exceptional circumstances" standard is that the former does not always require proof of harm to the child. In contrast, the latter always requires proof of serious physical or psychological harm or a substantial likelihood of such harm. Although it appears that, to date, all successful applications of the "exceptional circumstances" prong in this State have been limited to the *Sorentino*-type of psychological parentage, the Court has not, and need not in this case, define the full scope of this exception. Given the evolving dynamics within the family structure, the scope of "exceptional circumstances" must await case-by-case development. Based on the pleadings and the proofs adduced at trial, this case does not fall within the "exceptional circumstances" exception.

The standard that we articulate today has been applied, either in whole or in part, in most jurisdictions that have been confronted with the issue. Like this Court, they have created a presumption in favor of a parent that may be rebutted by proof of parental unfitness, neglect, or "exceptional circumstances." *See, e.g., C.G.*

*v. C.G.,* 594 *So.*2d 147, 149 (Ala.Civ.App.1991) (quoting *McLendon v. McLendon,* 455 *So.*2d 861, 862 (Ala.Civ.App.1984)) (requiring "clear and convincing evidence that the parent is unfit or unsuited for custody and that the best interest of the child will be served by granting custody to the third person"); *Maricopa County Juvenile Action No. JD–05401,* 173 `Ariz.` 634, 845 *P.*2d 1129, 1136 (Ariz.App.1993) (stating parental presumption can only be overcome by stringent standard requiring showing of unfitness or neglect); *In re Guardianship of D.A. McW,* 460 *So.*2d 368, 370 (Fla.1984) (stating parental presumption can be rebutted only if "detrimental to the welfare of the child" based on an exceptional circumstances test); *Carvalho v. Lewis,* 247 *Ga.* 94, 274 *S.E.*2d 471, 472 (1981) (applying unfitness or "compelling circumstances" test and noting "[a] court is not allowed to terminate a parent's natural right because it has determined that the child might have better financial, educational, or even moral advantages elsewhere"); *Stockwell v. Stockwell,* 116 *Idaho* 297, 775 *P.*2d 611, 613 (1989) (requiring unfitness, abandonment, or that "the child has been in the nonparent's custody for an appreciable period of time"); *In re Kirchner,* 164 *Ill.*2d 468, 208 *Ill.Dec.* 268, 649 *N.E.*2d 324, 334–35, 339 (1995) (stating nonparent only has standing to petition for custody of child if parent voluntarily and indefinitely relinquished custody, or upon a finding of unfitness); *In re Guardianship of Williams,* 254 *Kan.* 814, 869 *P.*2d 661, 669 (1994) (requiring unfitness, neglect, or highly unusual or extraordinary circumstances "even though the trial court might feel that it would decide otherwise if free to consider only the 'best interests' apart from the benefits to be derived from the love and care of the natural parent"); *Davis v. Collinsworth,* 771 *S.W.*2d 329, 330 (Ky.1989) (requiring unfitness or abandonment and noting that failure to provide essential care only qualifies when based on reasons other than poverty alone); *Sider v. Sider,* 334 *Md.* 512, 639 *A.*2d 1076, 1086 (1994) (requiring unfitness or exceptional circumstances); *White v. Thompson,* 569 *So.*2d 1181, 1183–84 (Miss.1990) (requiring abandonment, unfitness, or immorality); *Cotton v. Wise,* 977 *S.W.*2d 263, 264 (Mo.1998) (requiring unfit-

ness, abandonment, or "extraordinary circumstances"); *In re Guardianship of K.M.*, 280 *Mont.* 256, 929 *P*.2d 870, 873 (1996) (requiring voluntary relinquishment); *Henderson v. Henderson*, 174 *Mont.* 1, 568 *P*.2d 177, 181 (1977) (requiring unfitness, neglect, or delinquency); *Locklin v. Duka*, 112 *Nev.* 1489, 929 *P*.2d 930, 933 (1996) (requiring unfitness or extraordinary circumstances); *In re Adoption of J.J.B.*, 119 *N.M.* 638, 894 *P*.2d 994, 1008 (1995) (requiring unfitness or extraordinary circumstances); *Merritt v. Way*, 58 *N.Y.*2d 850, 460 *N.Y.S.*2d 20, 446 *N.E.*2d 776, 777 (1983) (requiring surrender, abandonment, unfitness, persistent neglect, or other extraordinary circumstances); *In re Woodell*, 253 *N.C.* 420, 117 *S.E.*2d 4, 7 (1960) (quoting *James v. Pretlow*, 242 *N.C.* 102, 86 *S.E.*2d 759, 761 (1955)) (stating natural parent has right to child which may only be interfered with "for the most substantial and sufficient reasons and . . . only when the interests and welfare of the children clearly require it"); *In re E.J.H.*, 546 *N.W.*2d 361, 364 (N.D.1996) (requiring a finding of exceptional circumstances "to trigger a best-interest analysis"); *In re Guardianship of M.R.S.*, 960 *P*.2d 357, 361–62 (Okla.1998) (quoting *Alford v. Thomas*, 316 *P*.2d 188 (Okla.1957)) (requiring unfitness or "circumstances of great weight and importance connected with the necessary welfare of the child"); *Ryan v. DeMello*, 116 *R.I.* 264, 354 *A*.2d 734, 735 (1976) (stating "the Family Court may award the custody of a child to a relative . . . if there has been a judicial determination that the child is delinquent, wayward, neglected, or otherwise comes within the purview of the Family Court Act"); *Moore v. Moore*, 300 *S.C.* 75, 386 *S.E.*2d 456, 458 (1989) (requiring unfitness unless parent temporarily relinquishes custody and then extraordinary circumstances); *D.G. v. D.M.K.*, 557 *N.W.*2d 235, 243 (S.D.1996) (requiring gross misconduct, unfitness, or "extraordinary circumstances" beyond "a simple showing" of best interests); *In re Adoption of Female Child*, 896 *S.W.*2d 546, 548 (Tenn.1995) (stating parent cannot be deprived of custody unless there has been a finding of substantial harm to the child); *Bailes v. Sours*, 231 *Va.* 96, 340 *S.E.*2d 824, 827 (1986) (quoting *Wilkerson v. Wilkerson*, 214 *Va.* 395, 200 *S.E.*2d 581, 583 (1973) (requiring

unfitness, abandonment, voluntary relinquishment or " 'special facts and circumstances ... constituting an extraordinary reason for taking a child from [a] parent' "); *In re S.B.L.*, 150 *Vt.* 294, 553 *A.*2d 1078, 1082 (1988) (requiring unfitness or extraordinary circumstances); *Snyder v. Scheerer*, 190 *W.Va.* 64, 436 *S.E.*2d 299, 304 (1993) (requiring unfitness, neglect, abandonment or waiver).

Four states rely on harm to the child, which is part of the "exceptional circumstances" exception. *See, e.g., Carter v. Novotny*, 779 *P.*2d 1195, 1197 (Alaska 1989) (requiring unfitness or that parental custody would be "clearly detrimental to the child."); *Nancy S. v. Michele G.*, 228 *Cal.App.*3d 831, 279 *Cal.Rptr.* 212, 214–15 (1991) (requiring a showing that "award of custody to a parent would be detrimental to the child"); *Hutchison v. Hutchison*, 649 *P.*2d 38, 41 (Utah 1982) (requiring unfitness or "that no strong mutual bond exists, that the parent has not demonstrated a willingness to sacrifice his or her own interest and welfare for the child's, and that the parent lacks the sympathy for and understanding of the child that is characteristic of parents generally"); *In re Marriage of Allen*, 28 *Wash.App.* 637, 626 *P.*2d 16, 23 (1981) (holding that something more than the "best interests of the child" is required to show "actual detriment to the child," but not requiring unfitness).

A small minority of jurisdictions apply a hybrid of the child's best interest test and the "exceptional circumstances" exception. *See, e.g., Freshour v. West*, 334 *Ark.* 100, 971 *S.W.*2d 263, 266 (1998) (recognizing preference for parent, but noting child's best interest is controlling); *Durkin v. Hinich*, 442 *N.W.*2d 148, 153 (Minn.1989) (noting presumption exists unless parent is unfit or "grave and weighty" reasons exist that "custody otherwise would not be in the best welfare and interest of the child"); *Stanley D. v. Deborah D.*, 124 *N.H.* 138, 467 *A.*2d 249, 251 (1983) (recognizing parental presumption, but making ultimate determination depend on child's best interests); *Charles v. Stehlik*, 560 *Pa.* 334, 339, 744 *A.*2d 1255, 1257 (2000) (same); *In re Kosmicki*, 468 *P.*2d 818, 823 (Wyo.1970) (requiring unfitness or best interest of child, but "in

proceedings involving children of tender years it is only in very exceptional circumstances that a mother should be deprived of the care and custody of her children").

One reason the overwhelming majority of states do not apply simply the child's best interests standard, or the ubiquitous, amorphous standard urged by the dissenters, is fear "that if taken to its logical conclusion, application of [that] standard 'could lead to a redistribution of the entire minor population among the worthier members of the community.'" Vanessa L. Warzynski, *Termination of Parental Rights: The "Psychological Parent" Standard*, 39 Vill. L.Rev. 737, 759 (1994) (quoting Helen Simpson, *The Unfit Parent: Conditions Under Which a Child May Be Adopted Without the Consent of His Parents*, 39 O. Det. L.Rev. 347, 355 (1962)). We have applied the parental preference to avoid "the danger of giving courts the power to award custody . . . to [nonparents] solely on the grounds of best interests. If [that] is the only criterion, then a judge may take children from their parents because the judge personally [disapproves of] the parents' limited means." *Turner v. Pannick*, 540 *P*.2d 1051, 1054 (Alaska 1975) (citing with approval *In re B.G.*, 11 *Cal*.3d 679, 114 *Cal.Rptr*. 444, 523 *P*.2d 244 (1974)).

The standard we adopt today is designed to reduce or minimize judicial opportunity to engage in social engineering in custody cases involving third parties. In contrast, under the standard urged by Justice Stein, custody would be awarded to a third party if the child's growth and development would be "detrimentally affected" by placement with a parent. *Post* at 290, 748 *A*.2d at 589 (Stein, J., dissenting). It appears that he is urging a camouflaged child's best interest standard. The use of such a standard to decide custody disputes between a fit parent and a third party will evolve into a "fitness contest" whose outcome will depend on the whims of the trial court. Application of Justice Stein's "detrimentally affected" standard to this case reveals only that it might be detrimental to Chantel to be raised by Larry when compared to

the Nelsons. He then concludes that the Nelsons might possibly be better parents than Larry. The danger inherent in that approach is that it permits reallocation of children by the judiciary—a system that would undoubtedly victimize poor people. *See* Carolyn Curtis, *The Psychological Parent Doctrine in Custody Disputes Between Foster Parents and Biological Parents,* 16 Colum. J.L. & Soc. Probs., 149, 155 (1980). The standard that we adopt has as its benchmark the welfare of the child while at the same time protecting parental rights.

## C.

To recapitulate, it is the relationship of the child to the person seeking custody that determines the standard to be used in deciding the custody dispute. When the dispute is between two fit parents, the best interest of the child standard controls because both parents are presumed to be equally entitled to custody. The child's best interest rebuts the presumption in favor of one of the fit parents. But, when the dispute is between a fit parent and a third party, only the fit parent is presumed to be entitled to custody. In that context, the child's welfare is protected because the presumption in favor of the fit parent is rebuttable. Once the presumption in favor of a fit parent is rebutted in the manner that we have expressed today, the child's best interest is advanced by not awarding custody to the parent. Viewed in that context, in custody determinations between a fit parent and a third party, as opposed to claims made between two fit parents, the child's best interests become a factor only after the parental termination standard has been met, rather than the determinative standard itself.

The standard that controls a custody dispute between a third party and a parent involves a two-step analysis. The first step requires application of the parental termination standard or a finding of "exceptional circumstances." Although an award of custody to a third party does not involve a termination of all

parental rights, "such an award destroys any pretense of a normal parent-child relationship and eliminates nearly all of the natural incidents of parenthood including everyday care and nurturing which are part and parcel of the bond between a parent and child." *Zack v. Fiebert*, 235 *N.J.Super.* 424, 432, 563 *A.*2d 58 (App.Div. 1989). "It is cardinal [in our society] that the custody, care and nurture of the child reside first in the parents." *Ginsberg v. New York*, 390 *U.S.* 629, 639, 88 *S.Ct.* 1274, 1280, 20 *L.Ed.*2d 195 (1968). Because the right to custody is a fundamental one protected by the constitution, *In re Guardianship of K.H.O., supra*, 161 *N.J.* at 347, 736 *A.*2d 1246, the parental termination or "exceptional circumstances" standard is required to pass constitutional muster in this type of custody dispute. That principle is consistent with *Zack* and *Todd*, which stand for the proposition that when a third party, such as a stepparent, establishes psychological parentage with the child, the third party stands in the shoes of a natural parent. *Zack, supra*, 235 *N.J.Super.* at 432–33, 563 *A.*2d 58; *Todd, supra*, 268 *N.J.Super.* at 397, 633 *A.*2d 1009. That means that when the "exceptional circumstances" prong is satisfied, for example by establishing that the third party has become a psychological parent, the standard for determining custody is the same as between two fit parents: the child's best interest test articulated in *N.J.S.A.* 9:2–4c. *Zack, supra*, 235 *N.J.Super.* at 433, 563 *A.*2d 58.

■■■■ If either the statutory parental termination standard or the "exceptional circumstances" prong is satisfied, the second step requires the court to decide whether awarding custody to the third party would promote the best interests of the child. A child's "best interests" standard "does not contain within it any idealized lifestyles." *Baby M, supra*, 109 *N.J.* at 460, 537 *A.*2d 1227. It "can never mean the better interest of the child." *Division of Youth and Family Services v. A.W.*, 103 *N.J.* 591, 603, 512 *A.*2d 438 (1986). "It is not a choice between a home with all the amenities and a simple apartment, or an upbringing with the classics on the bookshelf as opposed to the mass media, or even

between parents or providers of vastly unequal skills." *Ibid.* (citations omitted). That said, the point to be emphasized is that the best interest of the child cannot validly ground an award of custody to a third party over the objection of a fit parent without an initial court finding that the standard for termination of the rights of a non-consenting parent or the "exceptional circumstances" prong has been satisfied. Any contrary expressions in reported decisions are disapproved.

### D.

In this case, neither the trial court nor the majority in the Appellate Division applied the standard we articulate today. The Nelsons never claimed, nor could they, that Larry abandoned Chantel or was somehow unfit as a parent. Larry has been actively seeking custody since Megan's funeral. Furthermore, there is no evidence that a change in custody would harm Chantel. The one expert who testified was, in his own words, retained "in order to offer a recommendation as to whether [the Nelson's] could be suitable ... custodial candidates for Chantel." Despite those uncontroverted facts, the trial court ruled that the Nelsons were "in parity" with Larry and applied the best interests standard. In so doing, the court conferred upon the Nelsons rights that are co-extensive with those of a natural parent in a case in which there was neither a claim nor proof of *Sorentino*-type psychological parenthood or any other "exceptional circumstances." Hence, the trial court was mistaken under the facts of this case and the controlling legal principles.

In an attempt to fit this "square" case into a "round" precedent, the Appellate Division majority mistakenly used the *Sorentino* "exceptional circumstances" exception by taking "judicial notice that a nineteen month old has formed a psychological attachment to, and awareness of, her primary parent figure(s).". *Watkins, supra,* 321 *N.J.Super.* at 498, 729 *A.*2d 484. However, *Sorentino* is distinguishable. In *Sorentino,* the biological parents commenced suit fourteen months after the infant's birth. The natural

parents were described by this Court as "complete strangers" to the child. *Sees, supra,* 74 *N.J.* at 221, 377 *A.*2d 628 (distinguishing *Sorentino* ). In contrast, Larry has had significant and continuous contact with Chantel since her birth and throughout this unfortunate, lengthy dispute. If a parent remains in continuous contact with his or her child from birth and has actively sought custody since the child was three weeks old, the potential for serious permanent psychological harm from a transfer of custody to the natural parent is unlikely. *See, e.g., Sees, supra,* 74 *N.J.* at 222–24, 377 *A.*2d 628; *In re Guardianship of J.R.,* 174 *N.J.Super.* 211, 224, 416 *A.*2d 62 (App.Div.), *certif. denied,* 85 *N.J.* 102, 425 *A.*2d 266 (1980) (noting that critical to the ruling in *Sorentino* "was the undeniable fact that there was no relationship between child and natural mother"). Furthermore, under the facts of this case, the father-daughter relationship that has been ongoing since birth relieves Larry of any burden to prove that harm would not occur. *Beck v. Beck,* 86 *N.J.* 480, 494–96, 432 *A.*2d 63 (1981).

## III.

Because the Nelsons did not allege, and the evidence failed to establish, that Larry is an unfit parent, and because the Nelsons did not contend, or present proof that a change in custody would cause serious harm to Chantel, thereby satisfying the *Sorentino*-type "exceptional circumstances" prong, the trial court should have immediately awarded custody to Larry. Indeed, Justice Stein in his dissent agrees that the record does not establish that the Nelsons have become psychological parents. *Post* at 291–92, 748 *A.*2d at 590 (Stein, J., dissenting). Under the circumstances, there should be "an immediate vesting of custody of the child in the natural" father. *Sorentino, supra,* 72 *N.J.* at 131, 367 *A.*2d 1168; *Sees, supra,* 74 *N.J.* at 222–24, 377 *A.*2d 628.

However, we are not unmindful of the fact that for the last three and one half years, Chantel has resided with the Nelsons and has developed a close relationship with them. Although the

long delay in reaching the ultimate custodial determination causes some concern, Larry's constant contact with Chantel convinces us that a change in custody will not harm the child. Larry recognizes the importance of the child's relationship with the Nelsons in his concession that the Nelsons should have visitations with Chantel in the event custody is awarded to him.

We direct that the Nelsons transfer legal and physical custody to Larry within seven days of this decision "without further proceedings." *Sees, supra,* 74 *N.J.* at 221, 377 *A.*2d 628. The matter is remanded to the Family Part for the sole purpose of fixing a visitation schedule for the Nelsons, consistent with Larry's concession, that is comparable to the one presently granted to Larry. Unlike the dissenters with their rudderless standard, we are unwilling to misuse theories of bonding "to determine only [whether Larry] is optimum or even 'better' [than the Nelsons at parenting] in some vague social sense, rather than capable of rearing the child without serious harm." *In re Guardianship of J.C., supra,* 129 *N.J.* at 21, 608 *A.*2d 1312 (quoting *Baby M., supra,* 109 *N.J.* at 445, 537 *A.*2d 1227).

### IV.

We are compelled to comment on the extraordinarily long time this case has taken to wind its way through the judicial system. It started when Chantel was three weeks old and will not be completed until she is over three-and-one-half years old. That is too long. In an effort to avoid such unwarranted delays in the future, we establish the following protocol.

From its inception, this case involved a dispute over the custody of Chantel. It was never about protecting her property rights. It is a civil family action "in which the principal claim is unique to and arises out of a family or family-type relationship." *R.* 5:1–2. Perhaps believing that jurisdiction to hear an action for guardianship of a minor has been allocated to the Probate Part, the verified complaint for guardianship of Chantel was filed as a summary action in the Chancery Division, Probate Part, pursuant to *Rule*

4:83–1. An order to show cause was issued pursuant to *Rule* 4:67 based on the verified complaint and a certification filed by Ms. Nelson pursuant to *Rule* 4:83–5. Venue was laid, pursuant to *Rule* 4:83–4, in the county in which Chantel resided.

In the future, as soon as it becomes apparent that the complaint involves a custody dispute between a parent and a third party, the action should be transferred from the Probate Part to the Family Part pursuant to *Rule* 4:3–1(a)(2) & (3) and *Rule* 5:1–3(a) because the issues presented arose out of a family or family-type relationship. Once the matter reaches the Family Part, the Family Part's differentiated case management requires that the case be placed on "Priority Track" or "Expedited Track" pursuant to *Rule* 5:1–4(a)(1) or (3). Here, apparently the differentiated case management failed because it took the trial courts eighteen months to conclude the matter. The notice of appeal to the Appellate Division was filed on April 13, 1998. The case was argued in the Appellate Division on December 9, 1998 and decided six months later on May 28, 1999. Thirteen-and-one-half months is too long to handle this type of case given the potential impact unnecessary delay can have on a custody dispute. This Court is not without fault either. The notice of appeal was filed July 12, 1999 and the appeal has taken approximately eight months to be concluded.

The better practice requires that in the future, such an action be filed in the Family Part. The differentiated case management system should ensure that the action is concluded in the trial division within six months. If an appeal is taken from the trial court's determination, that appeal also should be concluded within six months. Similarly, any appeal to this Court should be concluded in six months. We do not intend to be insensitive about problems caused by backlogs and protracted dispositions. But in this type of custody dispute, justice delayed is justice denied; slow justice is not good justice. Neither can be tolerated.

The judgment of the Appellate Division is reversed and the matter is remanded to the Family Part for further proceedings consistent with this opinion.

O'HERN, J., dissenting.

The death of a parent must be one of the hardest things that a child can ever endure. Most of us have been spared that suffering. We can only derive a sense of that loss from works of literature such as James Agee's autobiographical novel, *A Death in the Family*. I fear that the Court may compound the tragedy of such a loss by creating a rule of law that will only add to the child's suffering in many circumstances. In essence, the Court holds that when a custodial parent dies, absent a showing that a surviving parent is unfit, a child will almost certainly be removed from his or her home within a very short time. Expedited hearings will be required even before the process of grieving will be ended. *Ante* at 257–58, 748 *A*.2d at 570. I believe that so rigid a rule will be harmful to children and dissent from the rule of law adopted by the Court.

A premise of the Court's ruling is that constitutional law gives a biological father, perhaps long separated from the child's mother, an almost automatic right to remove the child from the home where the child may long have received nurture and comfort. Realistically, the Court holds that a child must be taken from her home and placed in the custody of a parent whom she may have rarely seen unless (1) she can show that her father is so unfit a person that his parental rights would have to be curtailed under "an application of the parental termination standard," *ante* at 253, 748 *A*.2d at 568,[1] or (2) some person other than her deceased mother was her psychological parent. This latter circumstance is the only example given for what the Court describes as "exceptional circumstances." *Ante* at 254, 748 *A*.2d at 568. Because this second prong will never arise in the case of the death of a single

---

[1] Unexplained is the paradox that if this standard is met, the child will have lost both a mother and a father since her father (whom she may regard as imperfect but not unfit) must be removed from her life. Also unexplained is how this standard that requires that a parent shall have harmed a child, could have been applied in a case like this when the parent had had virtually no contact with the child.

custodial mother (by definition, she is the child's parent both biological and psychological), the child of a single mother will have to be immediately removed from her home setting unless she can establish the first prong of the Court's test. To force a child to make such a case against a father, with whom she might wish to maintain a strained but evolving relationship, only adds to her suffering. The requirement of "serious physical or psychological harm or a substantial likelihood of such harm," *ante* at 248, 748 A.2d at 565, is another way of stating the standard for termination of parental rights, *In re Guardianship of J.C.*, 129 *N.J.* 1, 608 A.2d 1312 (1992), not the appropriate standard for an interim award of custody of a bereaved child.

I respect the constitutional rights of a parent, but I also respect the human rights of a child. Our law has tended to view the law as a process designed to meet human needs. *See Procanik by Procanik v. Cillo*, 97 *N.J.* 339, 353, 478 A.2d 755 (1984) (observing that the Court's decision to allow recovery in a wrongful birth case was predicated on the "needs of the living"). I believe that the focus of the inquiry when a custodial parent dies should be on the needs of the child as well as the rights of the non-custodial parent. In this respect we may draw guidance from our long experience in developing a standard by which to determine whether parental rights should be terminated. We found that the concept of "best interests" of the child, then contained in *N.J.S.A.* 30:4C–15(c) and –20, was too vague and too abstract to provide guidance. We developed a four-part test that focused on the needs of a child, specifically the need to be free from harm and to a permanent plan that will ensure that the child will remain free from harm. *New Jersey Div. of Youth and Family Servs. v. A.W.*, 103 *N.J.* 591, 604–11, 512 A.2d 438 (1986). In *In re Adoption of Children by G.P.B., Jr.*, 161 *N.J.* 396, 736 A.2d 1277 (1999), this Court adapted a similar test applicable in the context of contested adoption cases to determine if the physical or mental health of the child would be harmed by continuing the relationship with a biological parent. Finally, in *J.C., supra*, Justice Handler ex-

plained how the breaking of bonds with a custodial figure may cause a child serious psychological or emotional harm that would justify termination of parental rights.

In this case the statutory standard under *N.J.S.A.* 9:2–5 requires a court, when a custodial parent dies, to "make such judgments and orders, from time to time, as the circumstances of the case and the benefit of the children shall require." I agree that that standard is too vague to govern the disposition of the important interests involved. In this setting, however, we deal with a much lesser intrusion on a parent's rights than termination of parental rights. Because the intrusion is lesser, the justification for intrusion may be less. The standard for governing the custody of a child whose custodial parent has died should depend on the degree of harm that a child will suffer if removed from the home surroundings and family that has until then nurtured the child. In his dissenting opinion, that I join, Justice Stein has convincingly demonstrated that constitutional requirements do not dictate a standard so inconsiderate of a child's needs as that which the Court adopts.

Of what kind of harm, then, should we speak? At a conference of the New Jersey Association for Children, a keynote speaker once observed: "Every child deserves a childhood." At first hearing, the expression sounds trite, but it contains a profound truth. Childhood means a combination of things but surely, for most of us, it means the warmth of love and caring from the adults in our lives, our childhood friends and that unique place that is home. (It is said that no other language has a word that conveys the same meaning as does, in our language, the word "home.") Justice Handler has explained that "[i]n applying these statutory standards [governing the custody of children], we are cognizant of New Jersey's strong public policy in favor of permanency. In all our guardianship and adoption cases, the child's need for permanency and stability emerges as a central factor." *In re Guardianship of K.H.O.*, 161 *N.J.* 337, 357, 736 *A.*2d 1246 (1999) (citing *J.C.*, *supra*, 129 *N.J.* at 26, 608 *A.*2d 1312). And in *A.W.*, *supra*, 103

*N.J.* at 610, 512 *A.*2d 438, the Court said: "If one thing is clear, it is that the child deeply needs association with a nurturing adult. Since it seems generally agreed that permanence in itself is an important part of that nurture, a court must carefully weigh that aspect of the child's life."

What I know or have learned of child development convinces me that the death of a custodial parent requires a balanced consideration of the needs of the child and the right of the non-custodial parent. A parent who is not legally unfit in the Title 9 sense [2] may yet not be able to help the child cope with the enormity of the death of a parent. A twelve-year-old daughter who has been witness to years of unrest between her mother and a separated father may not be able to bear the twin losses of her mother and her childhood home with all of its memories of love, laughter, and companionship.

At the time the transfer of custody was sought in this case, the father was himself still a young man. He had not completed his high school education. Realistically, he was not yet ready to be a parent. Yes, he did have the support of his wonderful family, including his parents and a sister. Thus, the choice for the court was really between two sets of equally loving grandparents and extended family members. To speak of the constitutional rights of a father as though the child had no right to the continued presence of those blood relatives who had nurtured her from birth belies the significance of the child's interest. In a recent book,[3] the author explains how on the death of his parents, which he described as like "being run over by a truck," he and his brother were together able to overcome their grief. He served as parent and companion to his younger brother.

---

[2] *N.J.S.A.* 9:6–8.21, for example, defines the abuse and neglect of a child that will justify protective custody arrangements.

[3] Dave Eggers, *A Heartbreaking Work of Staggering Genius* (2000).

In this case, the child of twelve days was so young that she would not have experienced the same grief. But the rule of law governing the death of a custodial parent must not be so inflexible as to deny a child the right to be free from the unwanted additional suffering of removal from a loving home where step-brothers, step-sisters or a grandparent may best fill the void from the loss of a parent.

The courts below did not have in place the rule of law that should govern a change of custody when a custodial parent dies. I would fashion a standard that would focus on whether the child would suffer physical, psychological or emotional harm from the loss of the continued relationship with those who had until then filled the child's life and home with love. That standard would serve as well, to guide the Court through its evaluation of the rights of grandparents under *N.J.S.A.* 9:2–7.1 to maintain a relationship with grandchildren both when there is a death of a custodial parent or other change in relationship. The inflexible standard adopted by the Court today puts in question the constitutionality of the Grandparents' Visitation Act because it elevates the parent's right of autonomy above the child's right to be free from the harm occasioned by the loss of love and nurture of those within the child's life.

In a reference to the current international debate about the return to his father of a child whose mother died en route to this country, a school psychologist writes:

The assumption that [such] a child ... would best be able to "grieve and heal" with his surviving parent is not borne out by the experience of many young people (letter, Feb. 5).

As a New York school psychologist who has worked with immigrant children and adolescents over the last 20 years, I believe that the extent to which a child can recover from the traumatic loss of a parent largely depends upon the surviving parent's capacity for emotional contact.

For many of my students, the expression of anger is not tolerated at home since it is viewed as a sign of disrespect; other parents may discourage talking about the dead relative, resulting in young children's swallowing their pain and anger. [Such a] case should not simply be decided on the "ties that bind parent and child" but in a way that respects his emotional needs.

[Toby L. Boritz, *Mourning His Mother, N.Y. Times,* Feb. 10, 2000, at A30.]

I favor a rule of law that respects the emotional needs of a child who has lost a custodial parent as well as the presumptive right of a separated parent to the custody of a child. The circumstances of the case will determine whether the harm to the child caused by a change in the custodial setting should outweigh that presumption.

I would remand this case to the Family Part for further proceedings in accordance with such a standard.

STEIN, J., dissenting.

In its attempt to resolve this difficult custody dispute between a child's maternal grandparents and its natural father, the Court adopts too rigid a rule of law. It mandates that on the death of a parent (in this case the child's mother) custody of the affected child must immediately revert to the surviving biological parent (the father) absent sufficient proof of unfitness to justify termination of the parental rights of the father. *Ante* at 244, 748 *A.*2d at 563. The Court elaborates by stating that the termination of parental rights standard is satisfied only by proof of "unfitness, abandonment, gross misconduct or 'exceptional circumstances.'" *Ante* at 245, 748 *A.*2d at 563. The Court defines "exceptional circumstances" to include the probability of "serious psychological harm to the child," *ante* at 246–47, 748 *A.*2d at 564, characterized by circumstances in which a sustained and enduring relationship between the child and the third party creates a status of psychological parenthood. *Sorentino v. Family & Children's Soc. of Elizabeth,* 72 *N.J.* 127, 131–32, 367 *A.*2d 1168 (1976), *appeal after remand,* 74 *N.J.* 313, 378 *A.*2d 18 (1977). The Court notes that the "*Sorentino*-type" case illustrates the only recognized application of the exceptional circumstances standard in our caselaw, *ante* at 248, 748 *A.*2d at 565, but implies that other proofs might satisfy the "parental termination or exceptional circumstances standard" provided that such proofs demonstrate "serious physical or psychological harm or a substantial likelihood of such harm." *Ante* at 248, 748 *A.*2d at 565. Because the Court's limited description of

the non-*Sorentino* "exceptional circumstances" standard uses the phrase *"parental termination or exceptional circumstances standard"* and requires proof of "serious physical or psychological harm," the clear implication of the Court's holding is that trial courts in similar cases must find evidence of harm analogous to that required to terminate parental rights in order to satisfy the Court's non-*Sorentino* test. As this Court held in *New Jersey Division of Youth & Family Services v. A.W.,* 103 *N.J.* 591, 604, 512 *A.*2d 438 (1986), "[in termination cases] [t]he primary focus of the court should be upon harm for which there is 'unambiguous and universal social condemnation.' *Developments in the Law— The Constitution and the Family,* 93 *Harv. L.Rev.* 1156, 1319 (1980). Paramount examples of such condemnation are evident in the context of physical and sexual abuse." Although the Court purports to establish an "exceptional circumstances" basis for overriding the presumption favoring custody in the natural parent, it declines to "define the full scope of the exception," stating that the scope of the exception must await "case by case development." *Ante* at 248, 748 *A.*2d at 565. In the meantime, the Court infuses the exceptional circumstances standard with a meaning almost synonymous with the level of harm required to support termination of parental rights.

The Court's standard is too inflexible. In cases like this one, in which the custody dispute is triggered by the death of a natural parent, the underlying tragedy is profound and, as Justice O'Hern observes, the Court's holding creates "a rule of law that will only add to the child's suffering in many circumstances." *Ante* at 259, 748 *A.*2d at 571. Instead of a rigid rule of law, the Court should adopt a rule that permits trial courts to exercise sufficient discretion, as reflected by the Family Part's decision below, to avoid unnecessary detriment to an already distraught child. The Court's standard, however, would treat as insufficient evidence that a transfer of custody would cause actual detriment to the child if that evidence did not demonstrate "serious harm," a

prerequisite to the termination of the father's parental rights. The Court's high standard of proof, analogous to the proof required to justify termination of parental rights, is so restrictive that its relevance in assisting courts to resolve difficult custody issues is sharply circumscribed, as is illustrated by the record before us.

In March 1998 the Family Part, after an extensive hearing, determined that physical custody of Chantel Ivonne Watkins–Murphy, born August 15, 1996, whose mother Megan Murphy, age seventeen, died twelve days after her birth, should remain with Beverly and Kevin Nelson, the maternal grandparents with whom Chantel had resided since birth. The father, Lawrence E. Watkins, Jr., nineteen years old when Chantel was born, was awarded visitation from Friday to Sunday evenings.

The Family Part's disposition indicated that although Larry had a warm and loving family that was available to assist him in caring for Chantel, the court was concerned about Larry's maturity. The court noted that Larry, at age twenty, had only recently graduated from high school and attempted during trial to obscure his educational background. The court expressed concerns about his limited job experiences, noting that he recently had held four different jobs for no longer than a few months each. The court expressed concern about the testimony of Larry's parents indicating their intent to sell their home and retire to North Carolina, in the context of Larry's testimony that if they relocated he would buy another home and remain in New Jersey. The court also noted that Larry's limited child support of twenty-five dollars weekly, his unwillingness to pick-up Chantel for his weekly visitation or to visit her at the Nelson house, and his failure to notice or participate with the Nelsons in treating Chantel's hypotonia condition (overly flexible joints) and slow development, were in contrast with the Nelson's recognition of Chantel's problem and early intervention to rectify it.

In short, ample evidence in the record existed to support a determination by the Family Part that an immediate transfer of

custody to Larry could result in actual detriment to Chantel because that evidence caused the court to have serious doubt about Larry's competence, in the event his parents were unavailable, to provide the special level of care that Chantel required. Although the Family Part applied a different standard, I agree with Justice O'Hern's observation that "[t]he standard for governing the custody of a child whose custodial parent has died should depend on the degree of harm that a child will suffer if removed from the home surroundings and family that has until then nurtured the child." *Ante* at 261, 748 *A*.2d at 572.

In my view, under that standard, ample evidence in the record would have supported the Family Part's award of physical custody to the Nelsons. The Court's decision to now award immediate custody to Larry within seven days, *ante* at 257, 748 *A*.2d at 570, without any knowledge of intervening events over the past two years, does not address responsibly or comprehensively the difficult issues posed by this appeal. Nor does the Court's opinion acknowledge that under its own characterization of the exceptional circumstances standard, the Nelsons may now be able to establish a psychological parenthood status that would trigger a best interest standard for determining custody. A remand to the Family Part to make findings concerning the relevant facts and circumstances that should today control an award of custody would be a more balanced and appropriate resolution of this appeal, and would avoid prematurely uprooting the child before custody is finally resolved.

## I

On August 27, 1996 seventeen-year-old Megan Murphy ("Megan") was killed in a tragic automobile accident. Her twelve-day-old daughter, Chantel Ivonne Watkins–Murphy ("Chantel"), survived the accident. Lawrence Watkins, Jr. ("Larry"), Chantel's father, was nineteen when Megan was killed. Larry and Megan had been dating for less than a year and had no plans to marry or live together at the time of the accident. At the time of Megan's

untimely death, Megan and Chantel were living with Megan's mother, Beverly Nelson, and her stepfather, Kevin Nelson (the "Nelsons"). The Nelsons had begun making plans to care for Megan and Chantel in their home when they learned that Megan was pregnant eight months earlier. Mrs. Nelson had postponed her continuing education to stay home and care for Chantel while Megan completed high school.

On September 4, 1996 the Nelsons filed a complaint for temporary guardianship of Chantel and for a determination of the paternity status of Larry. At an October 3, 1996 hearing the Chancery Division, Probate Part granted temporary guardianship to the Nelsons, primarily because Larry's paternity was in doubt. The Probate Part noted that "[i]t is not in the best interests of this child to be treated like a yo-yo" and allowed the Nelsons to retain temporary custody of Chantel. The Probate Part informed Larry that if he established paternity and showed that he had adequate "resources to take care of [Chantel]," then he would have the "first obligation and right to take care of [her]." Because the Chancery Division, Family Part was the proper forum for determining custody, the Probate Part made no determination concerning whether Larry should be granted custody of Chantel. The Probate Part suggested that Larry file an application for a determination of paternity and a complaint for permanent custody with the Family Case Management Office if Larry chose to seek permanent custody of Chantel. In an October 8, 1996 letter, however, the Probate Part acknowledged that there was no basis for requiring Larry to prove his paternity because Larry already had executed a Certificate of Parentage in accordance with *N.J.S.A.* 9:17–41. The Probate Part reiterated in that letter its decision to award the Nelsons temporary guardianship pending the Family Part's custody determination.

One week later, Larry filed an answer to the Nelsons' complaint seeking guardianship and filed a counterclaim seeking permanent custody of his daughter. A temporary custody hearing was held in April 1997. Through counsel, Larry objected to negotiating a

possible compromise through mediation. Therefore, the matter was transferred from the Probate Part to the Family Part. In May 1997, the Family Part judge ordered both parties to "attend Hunterdon County custody/visitation mediation program in order to address the issue of custody." Larry did not attend the mediation orientation and did not complete a questionnaire provided by the Family Case Management Office. In August 1997, the court found Larry in violation of litigant's rights for failing to attend court-ordered custody mediation and ordered both parties' counsel to provide the Family Part with briefs addressing the issue of custody under the present circumstances. The court also ordered a plenary hearing to be scheduled to address the custody issue.

The plenary trial to determine which party would be granted permanent custody of Chantel was held over four days in December 1997 and January 1998. Lawrence Watkins, Sr., Larry's father, testified that he picked up Chantel almost every weekend for her visits with the Watkins family and that Chantel's visits with the Watkins' lasted from Saturday morning until Sunday evening or afternoon. Mr. Watkins said that Larry did not pick up Chantel for her weekend visits with the Watkins because "there was some conflict" between Larry and Mrs. Nelson. He said that Chantel was "very close" to her father. Mr. Watkins testified that Larry contributed twenty-five dollars per week to the Nelsons in support of Chantel. Larry's sister and mother both testified that Larry expressed a strong desire to have permanent custody of Chantel.

Larry also testified in support of his claim for permanent custody of Chantel. Larry described his current employment with the Alternative Design company, where he was participating in a management training program. He had started the program two weeks prior to trial and was to be paid $250 to $300 a week until the program was completed. Larry testified that after the management training program was completed, he would earn $30,000 a year. Prior to working for Alternative Design, Larry had worked

for two months in the warehouse of a computer company as an inventory clerk. Prior to that, Larry worked for about two months in a temporary position unloading trucks for Lord and Taylor. Larry's other work experience was at Lechter's department store during high school. In order to care for Chantel while he was working, Larry planned to drop off Chantel at his cousin's home because his cousin had experience baby-sitting for children in the neighborhood. Larry's cousin operated her own daycare service and lived two houses away from the Watkins on the same block.

Larry stated that he was agitated by disagreements between himself and Mrs. Nelson concerning the possession of some of Megan's personal items, and relating to the religious differences between the Nelsons, who are Roman Catholics, and Larry, who is a non-practicing Jehovah's Witness. Larry wanted the Nelsons to maintain a relationship with Chantel as grandparents and felt that "they do have to be a part of her life," but he did not believe that Chantel should be exposed to the Nelsons' religious beliefs and holiday celebrations.

Larry acknowledged that he did not notice that Chantel had special developmental needs. Larry did not participate in the bi-monthly sessions of the early intervention program designed to address her hypotonia condition and slow development. Larry's mother and aunt attended the initial evaluation session of the early intervention program, but because the sessions were held during the middle of the day no member of the Watkins family participated in the early intervention program at Hunterdon Medical Center.

Larry testified that he had spoken to his parents about their plans to retire and move to North Carolina. When asked what he would do if his parents were to move to North Carolina, Larry described his plans:

Q. And what would you do if they were to go to North Carolina?

A. I would stay up here. My career's up here.

Q. Would you remain in the home that you grew up in?

A. No. I'd probably get my own.

Q. In your present earning situation, would you be able to afford to do that?

A. Yes, I would.

Q. Would you be staying in Cranford?

A. If not the surrounding area. I would try and stay close to family.

Larry was living with his parents at the time of trial and had never lived on his own away from his family.

Mrs. Nelson testified in support of her claim for permanent custody of Chantel. Mrs. Nelson described her continued studies at Rutgers University where she was working towards a Masters degree in social work. Mrs. Nelson planned to enroll Chantel in on-site daycare at Rutgers while she attended class or to leave Chantel with a neighborhood friend that Chantel was "very familiar with."

Mrs. Nelson described how she had become certified as a foster parent and, although the Nelsons were no longer foster parents, she testified that the Nelsons previously had been "named outstanding new foster parents in the State." Mrs. Nelson stressed the importance of a child knowing his or her ethnic background and presented an exhibit that showed the breadth of Chantel's extended family. Mrs. Nelson wanted Chantel to identify with Megan's Hispanic and Caucasian heritage in addition to Larry's African–American background. Mrs. Nelson believed that Chantel should be raised with knowledge of the Nelsons' Catholic faith, but that Chantel should be exposed to Larry's religious beliefs as well. The Nelsons and their three children all attend religious services regularly.

Mrs. Nelson testified about her experience with Chantel's developmental problems. The Nelsons enrolled Chantel in an early intervention program at Hunterdon Medical Center when they noticed that Chantel did not have the normal muscle tone found in a baby and had difficulty holding her head up, rolling over, and sitting up. Mrs. Nelson testified that those "floppy" characteristics were most likely inherited from Megan, who had struggled with her own learning disabilities during school. A physical

therapist and a speech/language pathologist determined that Chantel had delays in her expressive speech, cognitive abilities and motor skills. The initial assessment diagnosed Chantel with hypotonia, a condition in which weakened nerve connections lead to overly flexible joints in the body.

A bi-monthly physical therapy session was set up for Chantel to assist her in dealing with that condition. Doctors who performed a neurodevelopmental evaluation of Chantel suggested "that Chantel continue in the early intervention program if they can continue to see her" because her biologic relatives' history "with substance abuse, attention problems and learning difficulties may put Chantel at risk for some of these conditions as she grows." Mrs. Nelson testified that she had recently completed a two-weekend seminar offered by the New Jersey Council on Disabilities to better prepare her to address learning or physical disabilities that might arise in Chantel's future. Mrs. Nelson also testified that she recently enrolled Chantel in a "mom and tots" exercise class to help stimulate her joints and reduce the effects of her hypotonic condition.

Mrs. Nelson testified that Larry's mother indicated that the Watkins family wanted custody of Chantel at Megan's funeral. Mrs. Nelson was concerned about giving Chantel to Larry because she believed that Larry had a history of instability and was very immature. Mrs. Nelson also said that she had doubts about whether Larry was the biological father based on Chantel's skin tone and that those doubts affected her decision to keep Chantel after the accident. Mrs. Nelson also was concerned with Larry's "past history of depression" and that, during a conversation she had with Larry, Larry had mentioned that he felt suicidal on three occasions. Larry did not recall telling Mrs. Nelson that he was suicidal.

Despite those concerns, Mrs. Nelson testified at trial that it was in Chantel's best interest to be fully integrated into both families and that, as Chantel got older, she should spend more time with Larry. Mrs. Nelson testified that she considered herself to be a

psychological parent and gave an example of how she was dealing with Chantel's infancy:

> I guess already what we've done has been the early intervention, and being very aware. I have integrated—one of Chantel's problems was cognitive delay. So, what I've done with her at this point is, rather than just the normal verbal reinforcement, I'll repeat things more. Every time I pick her up, I'll repeat "up" several times. She didn't always seem to catch on right away on things. She needs to be shown things more than average for the connection, at least from what I've seen. So, what I'm doing now is personally tailoring what I think she needs for added reinforcement. What will happen as she get—she gets older, it will depend on school. If there is any learning disability—there's no way to know yet. But, again as in the one report, it was pointed out that subtle learning disabilities are very likely to be overlooked in a school system. So, part of it's—it's self-education, knowing what to look for and be very willing to advocate for her.

Mrs. Nelson also testified that she felt Chantel would adjust to longer visits, two to three night stays, with the Watkins family in the near future, but that she thought a child psychologist should determine if extended visits were appropriate for Chantel.

Dr. Robert Clyman, a clinical psychologist, testified regarding whether the Nelsons would be suitable custodial parents for Chantel. Dr. Clyman evaluated only the Nelsons. Dr. Clyman observed the Nelson family interact with Chantel and interviewed each member of the Nelson family, Chantel's early intervention physical therapist, the bereavement counselor who worked with the Nelsons, and other collateral sources in reaching his conclusion that the Nelsons would be suitable custodial parents. Dr. Clyman also testified that Chantel appeared to be integrated into the Nelson family. Dr. Clyman stated that he believed that the Nelsons, as former foster parents, would reach out to the Watkins family "after things are normalized," but that there was currently "very little communication" between the Nelsons and the Watkins.

Mr. Nelson was the final witness at trial. Although Mr. Nelson's job periodically required him to travel for extended periods of time, Mr. Nelson stated that he spent significant time with his three daughters. Mr. Nelson said that he was concerned about Larry's ambition and his future plans. Mr. Nelson believed that Larry was unemployed at the time that Dr. Clyman interviewed him. Mr. Nelson also testified that he believed that Larry's

mother was the force behind Larry's effort to obtain custody of Chantel.

On March 11, 1998 the trial court awarded custody of Chantel to the Nelsons. The trial court was "impressed" with both sets of grandparents and quoted from the report prepared by Dr. Clyman that concluded "that the Nelsons would be highly suitable parents for Chantel." The trial court recognized that

> the parent-child relationship is ordinarily not disturbed unless there is a clear showing of the parents' gross misconduct or unfitness. The courts have tended not to interfere with or deny the natural parent custody to his or her child.

The trial court noted the presumption in favor of the natural parent's superior right to custody, but recognized that that rule should not be followed in all situations. The trial court characterized the Nelsons as psychological parents and concluded that "Beverly and Kevin Nelson stand in the shoes of their deceased daughter Megan and are in parity with Lawrence Watkins Jr., thus the best interest standard should apply."

The trial court determined that awarding custody to the Nelsons was in the best interest of Chantel. The court noted that the Nelsons had noticed Chantel's hypotonia and had taken immediate steps to treat her condition. The court further noted that the Nelsons' family environment was stable in comparison to Larry, a twenty-year old with limited work experience who lived with his parents. The court was concerned with the support that Larry could provide Chantel and characterized his relationship with Chantel as "one of play, and not much other responsibility." The court found it was "significant" that Larry's parents were contemplating retiring in North Carolina and "that they may not be available in the future to assist their son." The court questioned Larry's maturity level and did not believe that Larry could care for Chantel on his own.

The court found that the Nelsons would make Chantel aware of her "biracial and mixed religious background" because they had experience dealing with those issues with one of their adopted daughters. The court noted the lack of communication between

Larry and the Nelsons and was concerned with the possibility that Larry and his family "would discourage contact with the Nelsons and thereby deprive Chantel access to half of her heritage." Therefore, the court concluded that Chantel's "physical and mental welfare will be better protected in the Nelson household." The court ordered the current weekend visitation schedule, which had been expanded to include Friday evenings, to remain in effect and awarded legal and residential custody to the Nelsons.

Larry filed a Notice of Appeal in April 1998. In July 1998 the Nelsons filed a Notice of Motion to set Larry's child support, fix a visitation schedule, and require Larry to submit to genetic testing to determine whether he is the biological father. Larry filed a certification on July 10, 1998 in response to the Nelsons' Notice of Motion, stating that he was presently unemployed because his temporary job had ended, but that he was "looking for a new job and expect[ed] to have a new job in about two weeks." Larry also opposed any change in the visitation schedule unless it provided him additional time with Chantel. Larry expressed resentment at the Nelsons' continued attempt to require him to be genetically tested to determine if he was the biological father of Chantel. The Family Part denied the Nelsons' motion.

The Appellate Division affirmed the Family Part's disposition because the trial court "appl[ied] the correct legal principles to fact findings that are clearly supported by substantial credible evidence." *Watkins v. Nelson,* 321 *N.J.Super.* 482, 484, 729 *A.2d* 484 (1999). The Appellate Division deferred to the trial court's conclusions "that the Nelsons are Chantel's psychological parents, and ... that as between [Larry] and the Nelsons, Chantel's best interest requires that custody remain with the Nelsons." *Id.* at 485, 729 *A.2d* 484. The Appellate Division quoted extensively from the trial court's letter opinion and cited the "ample precedent for granting custody to a psychological parent where that is in the best interest of the child." *Id.* at 493, 729 *A.2d* 484. The Appellate Division noted that

"[u]nfitness" is not the issue here. No one suggests that Watkins is an unfit parent. Rather the trial judge concluded that the evidence showed that it was in Chantel's best interest to remain in the primary care and custody of the Nelsons, while maintaining a strong relationship with Watkins and his family.

[*Id.* at 495–96, 729 *A.*2d 484.]

The Appellate Division affirmed "[t]he trial judge's conclusion that it is in Chantel's best interest to remain in the custody of the Nelsons" based on substantial evidence in the record. *Id.* at 496, 729 *A.*2d 484. Responding to their dissenting colleague, the majority declined to

apply a bright-line rule, essentially holding that a biological father who is not unfit, and who has maintained a relationship with his child, must be granted sole custody in preference to any other person, including the child's grandparents, who themselves have had the custody and care of the child virtually since birth by reason of the death of her mother. Such an absolute parental preference rule effectively forecloses custody to any other party, even one who has functioned in every way as a parent, unless the biological parent is sufficiently unfit that termination of that parent's parental relationship would be warranted. To adopt such a rule would be a mistake.

[*Id.* at 499–500, 729 *A.*2d 484.]

The Appellate Division concluded that the dissent failed to recognize "the significant precedent in New Jersey's common law for the proposition that the best interest of the child, and not parental unfitness, is the appropriate scale on which to balance the custodial claims of a biological parent against the claim of one ... who has functioned in every way as a parent." *Id.* at 500, 729 *A.*2d 484. The dissent argued that "[t]he correct legal standard in this dispute is parental unfitness," *id.* at 501, 729 *A.*2d 484, and that the trial court abused its discretion when it concluded that the Nelsons were psychological parents and therefore "in parity with [the] plaintiff so that the best interest standard applies." *Id.* at 504, 729 *A.*2d 484 (Braithwaite, J., dissenting).

## II

### A.

The law controlling custody determinations has developed as societies moved away from patriarchy and toward more egalitarian views of children, women, and family. A brief review of that

history and those developments will shed light on the emergence of contemporary law controlling child custody determinations.

The idea that children were the property of their parents was present during ancient times. "Aristotle believed the child was a parent's possession because it came physically from the parent, like a tooth or a lock of hair. In Aristotle's cosmology, it was the male seed, more divine than the base matter contributed by the female, that gave the child its life." Barbara Bennett Woodhouse, *"Who Owns the Child?": Meyer and Pierce and the Child as Property*, 33 Wm. & Mary L.Rev. 995, 1043 (1992)(citing Aristotle, *Nicomachean Ethics*, Book VIII, Ch. XII, 1161b (J.A.K. Thomson trans.1986) (footnote omitted)). Aristotle reasoned that

[t]here cannot be injustice in an unqualified sense towards that which is one's own; and a chattel, or a child until it is of a certain age and has attained independence, is as it were a part of oneself; and nobody chooses to injure himself (hence there can be no injustice toward oneself); and so neither can there be any conduct towards them that is politically just or unjust.

[Aristotle, *supra*, Book V, Ch. VI, 1134b, (*quoted in* Woodhouse, *supra*, at 1044).]

Our Court of Errors and Appeals summarized the ancients' treatment of children in *Lippincott v. Lippincott*, 97 *N.J. Eq.* 517, 519–20, 128 *A.* 254 (1925), as follows:

Greece, Egypt, Persia and the ancient civilizations generally, according to the historian Tytler, considered the child as a charge of the state, which, after early infancy, took the child into its control and educated him throughout youth, in the manners, customs, traditions and laws of the state, emphasizing in the curriculum loyalty to the state, as the first consideration from the child. Thus, says Aristotle in his "Politics," "it is an axiom that the best laws, though sanctioned by every citizen of the state, will be of no avail, unless the young are trained by habit and education in the spirit of the constitution."

The early Roman law, on the other hand, conceded to the father absolute dominion over the child, including the power of death, as a corrective. This arbitrary and unlimited power was afterwards modified by the state in the interest of the humanities, so that, in the days of the later emperors, a father was banished from the empire for having killed his son. 1 *Blackstone Com.* 451.

The English maintained a system of absolute parental control "subject to the power of the king, as *parens patriae*, to control the infantile status in the interest of the child, as well as in the interest of the state." *Lippincott, supra*, 97 *N.J. Eq.* at 520, 128 *A.* 254 (citing 1 *Blackstone Com.* 451).

The shift away from the conception of children as property was recognized by the New York Court for the Correction of Errors in *Mercein v. People*, 25 *Wend.* 64, 105–06 (1840), in which the Chancellors wrote:

> Upon a review of all the authorities binding upon the courts of this state, I have come to the undoubting conclusion, that the right of the father to the custody of his child is not absolute, and that such custody is referrable to its interest and welfare, and is to be selected by the court in the exercise of a sound judicial discretion, irrespective of the claims of either parent. This conclusion I believe is warranted by the law of this state, as well as by the law of nature. A sense of parental duty ought ever to withhold a parent from pressing his or her claims to the custody of a child, whenever the true interests of such child forbid it; and whenever this parental obligation fails to influence the conduct of the parent, it is fortunate that the enlightened principles of our law authorize our courts to interpose in behalf of the child.

*See also Lippincott, supra,* 97 *N.J. Eq.* at 521, 128 *A.* 254 (citing *Mercein* as early case that illustrates state's right to intervene on behalf of children).

In *Richards v. Collins,* 45 *N.J. Eq.* 283, 288, 17 *A.* 831 (1889), the Court of Errors and Appeals awarded the custody of a girl who was "of an age and capacity to form a sensible choice" to the aunt and uncle who had raised the girl. In what amounts to a nineteenth-century recognition of psychological parenthood, the Court reasoned as follows:

> Doubtless it is the strict legal right of parents and those standing *in loco parentis* to have the custody of infant children as against strangers. This right will control the judgment of the court, unless circumstances of weight and importance connected with the welfare of the child, exist to overbear such strict legal right.
>
> *The court will not regard the parental right as controlling, when to do so would imperil the personal safety, morals, health or happiness of the child. In determining this delicate and often difficult judgment, the court looks at the character, condition, habits and other surroundings of claimants.*
>
> In resolving the general question of what will best subserve the interest and happiness of the child, its own wish and choice may be consulted and given weight, if it be of an age and capacity to form a rational judgment. . . .
>
> The wishes of children of sufficient capacity to form them are given especial consideration, where the parents have for a length of time voluntarily allowed their children to live in the family of others, and thus form home associations and ties of affection for those having their care and nurture, and when it would mar the happiness of the children to sever such ties.

> The relation of parent and child is regarded as not fully characterized by the relative duties of service and support. Nature's provision of mutual affection commonly exists as the incentive to parental and filial duty and the bond of family union. *It is the instinct of childhood to attach itself and cling to those who perform towards it the parental office, and they become endeared to it by ministering to its dependence.*
>
> [*Id.* at 286–87, 17 *A.* 831 (emphasis added) (citations omitted).]

The *Richards* Court held that in a controversy over the custody of a child, the child's "welfare will be the paramount consideration in controlling the discretion of the court. *The strict right of the parent will be passed by, if a judgment in observance of such right would substitute a worse for a better custodian." Id.* at 287–88, 17 *A.* 831 (emphasis added).

At the dawning of the twentieth century, child welfare became a recognized social science and

> the concept of parental obligations as an outgrowth of divinely conferred paternal ownership and control of children had given way to that of parental trusteeship in the child's "best interests." This transformation reflected changing ideas about the relation of the individual to the state in a democratic republic, where individual liberty was the value most highly prized.
>
> . . .
>
> [M]arried women had gained a separate legal identity, and children, formerly private economic assets of parents, increasingly were viewed as individuals and proper subjects of public concern. Public policy, now drawn into molding and monitoring family relations, had joined forces with republican individualism to make obsolete the view of the child as paternal property subject to paternal whim.
>
> [Woodhouse, *supra,* at 1038–39 (footnotes omitted).]

In *Lippincott, supra,* 97 *N.J. Eq.* at 518, 128 *A.* 254, the Court of Errors and Appeals considered the claims of maternal and paternal grandparents to the custody of a girl, their granddaughter, whose parents had died. The Court's summary of the law implicated both the best-interests standard and the limitations on the rights of the natural parent:

> Manifestly, the touchstone of our jurisprudence in matters dealing with the custody and control of infants, is the welfare and happiness of the infant, and not the filial affections naturally arising from parental or family relationship.
>
> Thus, it has been quite generally held that even the natural right of the father to the custody of his child cannot be treated as an absolute property right, but rather as a trust reposed in the father by the state, as *parens patriae* for the welfare of the infant.
>
> [*Id.* at 519, 128 *A.* 254 (citations omitted).]

Consistent with *Richards, supra*, 45 *N.J. Eq.* at 287, 17 *A.* 831, and *Lippincott, supra*, 97 *N.J. Eq.* at 518, 128 *A.* 254, later New Jersey courts that ruled on custody and visitation issues emphasized the welfare of the child as the primary, albeit not dispositive, consideration. *Mimkon v. Ford*, 66 *N.J.* 426, 430, 332 *A.*2d 199 (1975)("In matters involving custody and visitation the ultimate concern of our courts is always for the welfare of the infant. This is the controlling element."); *Lavigne v. Family & Children's Soc. of Elizabeth*, 11 *N.J.* 473, 479, 95 *A.*2d 6 (1953)(reversing judgment returning child to natural parents who had surrendered child to agency for adoption and stating: "It has long been the settled law in the court of last resort in this State that in dealing with the custody and upbringing of an infant the welfare of the child is the controlling consideration."); *Brown v. Parsons*, 136 *N.J. Eq.* 493, 503, 42 *A.*2d 852 (E. & A.1945)(affirming award of custody to maternal grandmother despite claims of natural father and stating: "In a controversy over a child's possession, its welfare will be the paramount consideration in controlling the discretion of the court. The strict right of the parent will be passed by, if a judgment in observance of such right would substitute a worse for a better custodian."); *In re A.B.M.*, 132 *N.J. Eq.* 434, 441, 28 *A.*2d 518 (E. & A.1942) (reversing on grounds of abandonment award of custody to natural mother and noting: "Our law is clear on the subject. It is not the parental right but the interest of the child which is controlling."); *In re Mrs. M.*, 74 *N.J.Super.* 178, 183, 181 *A.*2d 14 (App.Div.1962) (ordering return of child to natural mother although she had entrusted child to caretakers and observing: "It is a principle of long standing that in dealing with the custody and upbringing of an infant the welfare of the child is the controlling consideration. Even parental rights must yield to this principle." (citations omitted)); *In re Flasch*, 51 *N.J.Super.* 1, 18, 143 *A.*2d 208 (App.Div.1958) (preserving custody in children's stepmother, rejecting custody claim by parents of natural mother and stating: "Particularly in a case of this nature, is it true that general principles of law do not decide concrete cases, as has been so aptly

said. Each matter must be decided on its own merits with the best interests and welfare of the children as the paramount consideration. To this principle, even parental rights must yield.").

Although the welfare of the child has dominated custody determinations since the late nineteenth century, most custody decisions have maintained a consistent but qualified emphasis on the rights of parents. In *In re Mrs. M., supra,* 74 *N.J.Super.* at 183–84, 181 *A.*2d 14, the Appellate Division summarized the law controlling custody determinations as follows:

> Although the safety, happiness, and physical, mental and moral welfare of the child is the prime determinant in custodial arrangements, common law courts have been sensitive to the "right" of a parent to the custody of his or her child. This right, which recognizes the natural bond of blood and affection between parent and child, is unlike a property right. It has been described as akin to a trust reposed in the parent by the State, as *parens patriae,* for the welfare of the infant. *Lippincott v. Lippincott,* 97 *N.J. Eq.* 517, 519, 128 *A.* 254, (E. & A.1925).

*See also Baum v. Kornberg,* 139 *N.J. Eq.* 265, 268–69, 50 *A.*2d 844 (E. & A.1947) (awarding custody of ten-year old boy to natural father rather than to uncle who had cared for child for six years and stating: "The rule of law is clear and has been enunciated many times: the welfare of the child is of paramount importance but the right of the parents is also to be considered. The difficulty, if any, in cases of this kind is its application."); *S.M. v. S.J.,* 143 *N.J.Super.* 379, 385, 363 *A.*2d 353 (Ch.Div.1976) (granting custody to step-father in preference to claim of natural mother and noting that " '[c]ourts have traditionally been reluctant to deny a parent custody of his or her child.' They should remain so. But, when the best interests of the child will be clearly served by custody in someone other than the parent, a finding of abandonment by the parent, or parental unfitness, is not a prerequisite to a custody order." (citation omitted)); *Ex parte R.L.,* 137 *N.J. Eq.* 271, 44 *A.*2d 396 (Ch.1945) (awarding custody to child's aunt in preference to claim of natural mother and stating: "[T]he natural and legal rights of the parent must, of course, be contemplated, but the subject of paramount consideration undoubtedly is the welfare of the child."); *Pope v. Brown,* 3 *N.J. Misc.* 572, 572–73,

128 *A.* 851 (Ch.1925) (awarding custody of one-year old child to father in preference to maternal grandparents and noting: "[T]he father has *prima facie* the legal right to the custody of his child, and, ordinarily, is entitled to have that right enforced by decree of this court in [custody] proceedings.... [That right] will not be enforced where such enforcement would 'imperil the personal safety, morals, health or happiness of the child.' "(citations omitted)).

Consistent with a seventy-year-long string of judicial decisions in this state that focus on the best interests of children, *see Richards, supra,* 45 *N.J. Eq.* at 287, 17 *A.* 831, the Appellate Division in *Hoy v. Willis,* 165 *N.J.Super.* 265, 272, 398 *A.*2d 109 (1978), stated that

[c]ourts have traditionally been reluctant to deny a parent custody of his or her child. *In re Mrs. M.,* 74 *N.J.Super.* 178[, 181 *A.*2d 14] (App.Div.1962). However, when the best interests of the child will clearly be served by a custody award to a third party, a finding of either parental unfitness or abandonment is not a prerequisite to the entry of an order doing so. *S.M. v. S.J.,* 143 *N.J.Super.* 379[, 363 *A.*2d 353] (Ch.Div.1976).

Two Appellate Division decisions have characterized the natural parent's preferred right of custody in stronger terms, and have raised the burden of proof for third parties who challenge the custodial claim of a natural parent. In *In re D.T.,* 200 *N.J.Super.* 171, 176, 491 *A.*2d 7 (1985), the Appellate Division stated that

[s]ince the right of parents to the custody of their minor children is both a natural and legal right, the law should not disturb the parent/child relationship except for the strongest reasons and only upon a clear showing of a parent's gross misconduct or unfitness or of other extraordinary circumstances affecting the welfare of the child.

Similarly, in *Zack v. Fiebert,* 235 *N.J.Super.* 424, 432, 563 *A.*2d 58 (1989), the Appellate Division noted that

[u]nder ordinary circumstances, a custody action by a third party against a natural parent is more like a termination action than a custody action between biological parents. Although visitation may be preserved, such an award destroys any pretense of a normal parent-child relationship and eliminates nearly all of the natural incidents of parenthood including the everyday care and nurturing which are part and parcel of the bond between a parent and child. Thus, normally, when a third party seeks custody as against a natural parent, the standard should be the termination standard of unfitness. See *E.T. v. L.P., supra,* 185 *N.J.Super.* at 81[,

447 *A.*2d 572]. The application of this standard is footed in the presumption in favor of the natural parent's superior right to custody. See *Matter of D.T., supra,* 200 *N.J.Super.* at 175–76, 491 *A.*2d 7.

The suggestion in *Zack,* and the majority's holding in this appeal, that unfitness sufficient to justify termination of parental rights is the primary standard for supporting an award of custody to a third party rather than a natural parent unduly limits the discretion of trial courts in custody cases. In *New Jersey Division of Youth and Family Services v. A.W., supra,* 103 *N.J.* at 604–11, 512 *A.*2d 438, we developed a four-part test for termination proceedings that required proof that the parental relationship would seriously impair the child's health and development and that delay in placing the child elsewhere would add to the harm, noting that examples of such condemnation "are evident in the context of physical and sexual abuse." *Id.* at 604, 512 *A.*2d 438 (citation omitted). In a custody dispute between a third party custodian and a natural parent seeking custody, proof that the natural parent already has inflicted such severe harm rarely will exist, and so high a threshold of proof is thus unnecessary and inappropriate.

Although *D.T.* and *Zack* generally raised the standard for denying natural parents custody and for granting custody to third-parties, the Appellate Division noted in *Zack* that if a

third party is able to show that he or she stands in the shoes of a parent to the child and thus in parity with the natural parent, he or she should be accorded the status of a natural parent in determining the standard to be applied to the quest for custody. In such circumstances, the best interests test should apply.

[*Zack, supra,* 235 *N.J.Super.* at 432, 563 *A.*2d 58 (citing *In re Baby M.,* 109 *N.J.* 396, 445, 537 *A.*2d 1227 (1988)).]

The tension between the welfare of the children, parents' rights, and judicial reluctance to find in favor of third parties over fit natural parents has been reconciled by one commentator:

Although the two approaches are distinct in theory and not always compatible, in most cases they will lead to the same conclusion and are different ways of emphasizing the same goal. It has been suggested that most courts which apply the "best interest" test in a custody conflict between parents and grandparent[s] seem merely to disguise the application of the parental right doctrine by using as a device the presumption that custody by the parents will be in the best interest of the child. Thus, while, ordinarily, the natural right of the parents will prevail in a contest between them and the grandparents where both parties are equally fit to

care for the child and the parents are not chargeable with laches or forfeiture as having left the child with the other party, in a particular case the forces of environment may be so strong as to compel the court in the best interests of the child, to deny the natural right of the parents even where otherwise they are perfectly fit persons to have custody of the child.

[D.E. Ytreberg, Annotation, *Award of Custody of Child Where Contest is Between Child's Parents and Grandparents,* 31 *A.L.R.*3d 1187, 1191 (1970)(footnotes omitted).]

*See also Zack, supra,* 235 *N.J.Super.* at 430 n. 2, 563 *A.*2d 58 ("It has been suggested that these two theories [parental rights and best interests] are not in actual conflict, because the 'best interests of the child' doctrine presumes that custody by the natural parent will be in the child's best interests.").

In addition to considering the natural parent preference and the best interests of a child, this Court further developed the law controlling custody determinations when we recognized in *Sorentino I, supra,* 72 *N.J.* at 131–32, 367 *A.*2d 1168, that the rights of parents to custody of a child may be limited by the child's relationships with other adults. We noted that "[t]he court cannot evade its responsibility, as *parens patriae* of all minor children, to preserve them from harm. The possibility of serious psychological harm to the child in this case transcends all other considerations." *Id.* at 132, 367 *A.*2d 1168 (citations omitted). In *Sorentino I* we required plaintiffs seeking to remove a child from the only home known to the child to carry "the burden of proving by a preponderance of the credible evidence that the potentiality for serious psychological harm accompanying or resulting from such a move will not become a reality." *Id.* at 133, 367 *A.*2d 1168.

We further discussed the doctrine of psychological parenthood in *Sees v. Baber,* 74 *N.J.* 201, 221–23, 377 *A.*2d 628 (1977), a case in which we returned a child to his natural parent in the absence of a showing of psychological parenthood. We noted that "[i]t has been recognized that the psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood." *Id.* at 222, 377 A.2d 628 (citing J. Goldstein, *et al., Beyond the Best Interests of the Child* (1973)). In *Sees* we

were "entirely satisfied that there is no statutory or legal basis upon which to deny or resist [the] plaintiff's claim *qua* parent to the full custody of her child." *Id.* at 221, 377 *A.2d* 628. Despite that disposition, we noted that "[i]t is possible ... for facts to arise in a given setting which might obtrude upon what is otherwise a clear legal picture in favor of a natural parent, and move the court to exercise its equitable powers pursuant to its *parens patriae* jurisdiction with respect to the custody of the child." *Ibid.* *See also Todd v. Sheridan,* 268 *N.J.Super.* 387, 398–99, 633 *A.2d* 1009 (App.Div.1993)(applying best interests test because maternal grandparents were primary caretakers of child and functioned as her psychological parents); *Hoy, supra,* 165 *N.J.Super.* at 277, 398 *A.2d* 109 (granting custody of child to third party because "there was a probability of severe and long-term psychological damage should a transfer of custody [to the natural parent] occur"); *Zack, supra,* 235 *N.J.Super.* at 432–33, 563 *A.2d* 58 (holding that best interests standard applies when third party seeking custody of child over natural parent is able to show that he or she is psychological parent).

### B.

The third-party versus natural-parent custody jurisprudence of other states, like New Jersey's, ultimately focuses on doing what is in a child's best interest. It is generally presumed that to be with a natural parent is in a child's best interest. The various states give the presumption different weights. Although all states will grant custody to a third party if a natural party is shown to be unfit, in some states that is the sole means of overcoming a natural parent presumption. *Ex parte Mathews,* 428 *So.2d* 58, 59 (Ala.1983)(holding that natural parent preference may only be overcome by finding "that the parent seeking custody is guilty of such misconduct or neglect to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question"); *McKee v. Flynt,* 630 *So.2d* 44, 47 (Miss.1993)(holding that natural parent preference may be

overcome only by "clear showing that the parent has (1) abandoned the child, or (2) the conduct of the parent is so immoral [as] to be detrimental to the child, or (3) the parent is unfit mentally or otherwise to have the custody of his or her child.").

Other states allow the presumption in favor of a natural parent to be rebutted on a showing of exceptional circumstances. See *Merritt v. Way*, 58 *N.Y.*2d 850, 460 *N.Y.S.*2d 20, 446 *N.E.*2d 776, 777 (1983)("In a custody contest between parent and nonparent, the question of best interests is not reached absent a showing of surrender, abandonment, unfitness, persistent neglect or other extraordinary circumstance."); *Cotton v. Wise*, 977 *S.W.*2d 263, 264 (Mo.1998) (stating that rebuttable presumption in favor of natural parent "may be overcome by evidence that a parent is unfit, unable or unwilling to take charge of the child"); *In re E.J.H.*, 546 *N.W.*2d 361, 364 (N.D.1996) ("In custody disputes between a natural parent and a third party, exceptional circumstances may require, in the child's best interest to prevent serious harm or detriment to the child, that the child be placed in the custody of a third party rather than with the natural parent."); *Bailes v. Sours*, 231 *Va.* 96, 340 *S.E.*2d 824, 827 (1986)(natural parent preference may rebutted by showing of unfitness or of "special facts and circumstances . . . constituting an extraordinary reason for taking a child from its . . . parents").

Focusing on the effects a custody determination will have on a child while maintaining the natural parent preference, a few states incorporate both the rights of parents and the needs of children into their analyses permitting custody to be awarded to the third party on a showing that granting custody to the natural parent is likely to result in actual detriment to the child. In *C.R.B. v. C.C.*, 959 *P.*2d 375, 380 (Alaska 1998), the Supreme Court of Alaska noted that the natural parent preference is overcome if granting custody to a parent is clearly detrimental to a child. That approach is different from a best-interests approach in that it requires nonparents "not merely to prove by a preponderance of the evidence that [they] can better serve a child's interests, but to

prove by 'clear evidence' that a parent is unfit or that his or her custody is clearly detrimental." *Ibid.* Alaska uses that approach "despite an inevitable sacrifice of children's interests in cases where a nonparent can better serve those interests, but a parent's custody is not 'clearly detrimental.' " *Ibid.*

Washington likewise follows a standard that requires that "the non-parent establish either that the parent is unfit or that 'circumstances are such that the child's growth and development would be detrimentally affected by placement with an otherwise fit parent.' " *In re Custody of Stell*, 56 *Wash.App.* 356, 783 *P.*2d 615, 620 (1989)(quoting *In re Marriage of Allen*, 28 *Wash.App.* 637, 626 *P.*2d 16, 22 (1981)). In *Allen*, a stepmother was granted custody of a deaf child over the child's natural father. The *Allen* court found that granting custody to the child's father would be a detriment to the child because his father possessed minimal sign language skills whereas his stepmother and step-siblings knew sign language, and the child's educational and developmental progress were the result of the stepmother's efforts. *Id.* at 22–23. Citing J. Goldstein, A. Freud, and A. Solnit, *Beyond the Best Interests of the Child*, the *Allen* court sought a "middle ground" between the most common custody standards:

[T]o give custody to a nonparent there must be more than the "best interests of the child" involved, but less than a showing of unfitness. In extraordinary circumstances, where placing the child with an otherwise fit parent would be detrimental to the child, the parent's right to custody is outweighed by the state's interest in the child's welfare. There must be a showing of actual detriment to the child, something greater than the comparative and balancing analyses of the "best interests of the child" test. Precisely what might outweigh parental rights must be determined on a case-by-case basis. *But unfitness of the parent need not be shown.*

[*Allen, supra*, 626 *P.*2d at 23 (emphasis added).]

Finally, some states permit the best interests of a child alone to overcome a presumption in favor of a natural parent, recognizing that the denial of an award of custody is not equivalent to a termination of parental rights. Accordingly, those states do not require proof of exceptional circumstances or that a parent is unfit, but focus instead on what is best for the child. In *Charles v.*

*Stehlik,* 560 *Pa.* 334, 744 *A.*2d 1255 (2000), the Supreme Court of Pennsylvania recently summarized its approach to custody determinations. That court noted that between a natural parent and a third party the natural parent preference will be overcome only if convincing reasons appear that the child's best interest will be served by an award to the third party. *Id.* 744 *A.*2d at 1257. The *Stehlik* court stressed that the biological parent's prima facie right to custody

> is not to be construed as precluding a custody award to a non-parent, absent a demonstration of the parent's dereliction. We again emphasize that the standard seeks only to stress the importance of parenthood as a factor in determining the best interests of the child. However, other factors which have significant impact on the well being of the child can justify a finding in favor of the non-parent, *even though the parent has not been shown to have been unfit.*
>
> . . .
>
> [T]he cardinal concern in all custody cases is the best interest and permanent welfare of the child. In staying true to that maxim, we have decreed that *there will be instances where it is proper to award custody to the third party even where there has been no showing that the biological parent is unfit.* While this Commonwealth places great importance on biological ties, it does not do so to the extent that the biological parent's right to custody will trump the best interests of the child. In all custody matters, our primary concern is, and must continue to be, the well-being of the most fragile human participant—that of the minor child.
>
> [*Id.* at 1258 (quoting *Albright v. Commonwealth. ex rel Fetters,* 491 Pa. 320, 421 A.2d 157, 161 (1980) (citations and internal quotation marks omitted and emphasis added)).]

*See also Abrams v. Connolly,* 781 *P.*2d 651, 657 (Colo.1989)("The long-standing principle of Colorado law is that the best interests of the child are the overriding considerations in matters of child custody. Although there is a presumption that a natural parent has a first and prior right to custody of his or her child, the presumption may be rebutted by evidence establishing that the welfare of the child would be promoted by awarding custody to a nonparent." (citation omitted)); *Tailor v. Becker,* 708 *A.*2d 626, 628 (Del.1998)(upholding statute that requires best interests analysis in custody disputes between custodial stepparent and natural parent); *Henrikson v. Gable,* 162 *Mich.App.* 248, 412 *N.W.*2d 702, 704 (1987)("[A] showing that a parent is unfit is not required to overcome this presumption.... [I]n order to overcome the natu-

ral parent presumption, the trial judge was required to find that ... defendant clearly and convincingly established that the best interests of the children required maintaining custody with defendant."); *Stanley D. v. Deborah D.*, 124 *N.H.* 138, 467 *A.*2d 249 (1983) ( holding that there is no need to find natural parent unfit, balancing rights of natural parents and holding that "the paramount and controlling consideration is the overall welfare of the children involved").

The majority's survey of the custody jurisprudence of other states reveals that different standards are applied throughout the country in determining to whom custody should be granted in a dispute between a third party and a natural parent. The Court correctly concludes that the majority of states appear to require proof of either unfitness or other exceptional circumstances before custody will be awarded to a third party rather than a natural parent, but the content of the exceptional circumstances standard varies from state to state and application of the standard appears to be significantly influenced by the specific facts.

## III

I dissent from the majority opinion because its requirement that third parties seeking custody of children satisfy a standard that is essentially equivalent to the termination-of-parental-rights ·standard is a return to unnecessary formalism discarded by our jurisprudence over a century ago. The majority's standard is inflexible and will lead to harsh results. I favor, and the state's children would benefit from, a child-centered approach that considers whether placing a child with a natural parent instead of a third party would cause actual detriment to the child.

As early as 1889, this Court's predecessors discarded notions of children as property when it declared that New Jersey courts "will not regard the parental right as controlling, when to do so would imperil the personal safety, morals, health, or happiness of the child." *Richards, supra,* 45 *N.J. Eq.* at 287, 17 *A.* 831. By requiring that third parties satisfy the heightened standard of

proof of unfitness applicable to termination of parental rights proceedings, a standard applied to natural parents who never again will see their children, the Court rejects longstanding decisional law that recognizes the importance of subordinating parental rights to avoid detriment to a child.

The record before the Family Part clearly was adequate to sustain that court's custody determination under the standard that I favor: absent proof of a psychological parent relationship, the non-parent must establish "either that the parent is unfit or that 'circumstances are such that the child's growth and development would be detrimentally affected by placement with an otherwise fit parent.'" *Stell, supra,* 783 *P.*2d at 620 (quoting *Allen, supra,* 626 *P.*2d at 22).

The testimony before the Family Part demonstrated that, as the court observed, Larry has "a caring close knit family." The court noted that it was "impressed with the plaintiff's parents," commenting on testimony by Mr. Watkins Sr. about the characteristics of a good father and the thoughtful testimony of Mrs. Watkins on the issue of a child's religious training.

The court was not favorably impressed by Larry's testimony in several respects. The court was critical of Larry's "attempt to obscure his educational background," referring to his reluctance to explain why he was delayed in obtaining a high school diploma. The court noted with disapproval that Larry relies on his father to provide transportation for Chantel's visits, observing that Larry never visits Chantel at the Nelson's home, that his involvement with her "is one of play and not much other responsibility," and that his contribution of $25.00 per week "raises responsibility questions with this level of support."

Although the court acknowledged that the Watkins family environment was "responsible" and "stable," it emphasized that "custody is being sought by [Larry] and not his family." The court expressed significant concern about the possibility that if Larry's parents relocated to another state, Larry would not be capable of caring for Chantel: ·

An issue that arose during the course of the testimony was that shortly his mother and father will be moving to North Carolina upon retirement. Lawrence E. Watkins Jr. does not give me the same sense of responsibility and security as his parents do. He has had limited job experience, has worked at four jobs for no longer than a couple of months each. His maturity is questionable, he would not be able to care for Chantel on his own.

(At oral argument the Court was informed that Larry's parents no longer plan to leave New Jersey, but that information was not in the record before the Family Part.)

In contrast, the Family Part was favorably impressed with both Beverly and Kevin Nelson and their parenting skills. The court emphasized the significance of the Nelsons' early recognition of Chantel's developmental problems and their initiative in enrolling her in an intervention program at Hunterdon Medical Center. The court also noted with approval "the Nelson family's reinforcement of [Chantel's] learning processes."

The court also emphasized the findings of Dr. Clyman who evaluated Chantel's interaction with the Nelsons, observing that Dr. Clyman "found Chantel to be fully integrated into the Nelson family, that is, not only with Beverly and Kevin, but with Jessica, Emily and Dorothy as well." The court referred to Dr. Clyman's observation that Chantel "was happily adjusted, well behaved and easily reacted with her siblings."

The Family Part, relying on *Zack v. Fiebert, supra,* 235 *N.J.Super.* 424, 563 *A.*2d 58 and *Hoy v. Willis, supra,* 165 *N.J.Super.* 265, 398 *A.*2d 109, concluded that the Nelsons functioned as psychological parents to Chantel and therefore "stand in the shoes of their deceased daughter Megan and are in parity with Lawrence E. Watkins Jr., thus the best interest standard should apply." Based on that standard, the court concluded that "Chantel's physical and mental welfare will be better preserved in the Nelson household. They have already demonstrated an ability to discover problems and immediately deal with them."

Because Chantel was only sixteen months old at the commencement of the plenary hearing, and no expert testimony was offered on the issue of whether a psychological parenting relationship

existed between the Nelsons and Chantel, see *Sorentino I, supra,* 72 *N.J.* at 133, 367 *A.*2d 1168, the Family Part's conclusion that a psychological parenting relationship existed is unpersuasive. Accordingly, its use of a best interests standard in making the custody award to the Nelsons undoubtedly was inappropriate. Nevertheless, that court's findings and conclusions clearly would have supported the same custody determination under the more stringent standard that I propose, based on the evidence that Chantel's growth and development would have been "detrimentally affected" by placement with Larry. The Family Part clearly expressed its view that Larry had not demonstrated that, without assistance from his parents, he was capable of assuming full responsibility for the care and supervision of Chantel. Accordingly, the evidence and the court's findings supported the Family Part's custody award, notwithstanding that it applied an inappropriate standard.

More than two years have elapsed since the custody hearing. Chantel is now more than three and one-half years old and has resided with the Nelsons since birth. This Court is uninformed about the events that have occurred since the custody hearing with respect to the Nelsons, Larry and Chantel. Under those circumstances, a reversal of the custody award made in March 1998, combined with an immediate unsupervised transfer of custody to Larry, is manifestly inappropriate. That disposition poses a significant and unnecessary risk to Chantel's interests.

In my view, the appropriate result is to remand this matter for a new custody determination by the Family Part. On remand the Nelsons would be free to offer proof through expert testimony that they presently have established a psychological parenting relationship with Chantel. If the court so finds, a best interest standard can be applied in making the award of physical custody and visitation. Absent such a finding, the court should award custody to Larry unless it determines that he is unfit or that the award of custody to him would be likely to cause actual detriment to Chantel's growth and development.

Justice O'HERN joins in this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices GARIBALDI, COLEMAN, LONG and VERNIERO—5.

*For remandment*—Justices O'HERN and STEIN—2.