Plummer v. Gibson.

---

ANNA PLUMMER, by Mary E. Moore, her guardian,

v.

EMMA CORDELIA GIBSON.

[Filed January 4th, 1900.]

1. Where a testator left his estate to two daughters, as joint tenants, and to the survivors of them, on condition that they should live together on the estate, because he expected one to care for the other, who was an imbecile, with the intention that her interest should be used for her support by the former, as trustee, according to her discretion, the trustee's interest could not be taken by the guardian of the imbecile for her support, when the trustee had not refused to support her.

Plummer v. Gibson.

2. Where a trustee is given discretionary power by will to devote, not only the income, but the entire trust estate, for the support of an imbecile beneficiary, a court of equity can direct that a part of the *corpus* of such estate, as well as the income, shall be used for that purpose, if essential.

3. A trustee of an imbecile is not disqualified to have custody of the person of such imbecile merely because he is entitled to the imbecile's estate after death.

On final hearing.

*Mr. Horace F. Nixon* and *Mr. David O. Watkins*, for the complainant.

*Mr. Clement H. Sinnickson*, for the defendant.

REED, V. C.

James L. Plummer, by his will, left the residue of his property to his two daughters, Emma Cordelia Gibson, the defendant, and Anna Plummer, an imbecile, as joint tenants, and to the survivor of them; and appointed Emma Cordelia Gibson trustee of Anna's share, with power to sell or dispose of any of said property, as well the share of Anna as her own, whenever in her judgment such sale should be advisable.

The testator then proceeded as follows :

"I desire her to see that my daughter Anna is suitably nursed and attended and provided for, so long as she may live, and authorize said trustee to apply principal or income of Anna's share of said residue as may answer for that purpose. I make this disposition of my property because I deem my other children well provided for, and that my daughter Emma Cordelia Gibson has always lived with me and cared for me and for her afflicted sister Anna. I desire to provide as far as possible for the care and maintenance of Anna, who is unable to care for herself, and I regard my property as no more than sufficient for the comfortable maintenance and support of my said two daughters."

James L. Plummer, the testator, died January 23d, 1892, aged eighty-two. Previous to his death Anna had been declared a lunatic, and Mary E. Moore, a sister of Anna, was appointed guardian of her person and property on June 9th, 1891.

Up to the time of her father's death, Anna, the imbecile, had

lived with him and her sister, Emma Cordelia Gibson, who was her father's housekeeper. Anna remained with her sister, Emma Cordelia Gibson, after their father's death until June 19th of that year, when Mary E. Moore, her guardian, visited the house where they lived, and took Anna away with her. From that time Anna has lived with her sister, Mary E. Moore.

Mary E. Moore now files the bill in this case in behalf of her ward, for the purpose of compelling Emma Cordelia, her sister, and the trustee for the imbecile sister under the will of their father, to account to the imbecile ward, and for the further purpose of getting a decree of this court fixing the amount which shall be paid, both now and in the future, by Emma Cordelia to the complainant.

At the time of his death, James L. Plummer, was the owner of considerable real estate in and around Swedesboro, New Jersey. Some of it was mortgaged, and Mrs. Moore, by inducing the mortgagees to foreclose, created a surplus belonging to the estate, amounting to $3,356.34, which surplus has been paid into this court. There are still left belonging to the estate fourteen lots variously valued. The tract styled in the testimony "No. 14" is occupied by Mrs. Moore and her husband. In that tract, I understand, Mrs. Moore has owned a one-half interest, the other one-half interest belonging to the estate, and there is a mortgage upon the property amounting to $2,000. The real estate belonging to the estate is now worth probably $6,500, possibly $7,000. The imbecile's one-half of this, at the latter figure would be $3,500, which, added to her one-half interest of the money in court, namely, $1,678.17, would make up the sum of $5,178.17. Mrs. Moore has a sum of $191.50 coming from another source, which also belongs to the imbecile. Mrs. Gibson has a balance of $610.75, less her commissions, in hand, one-half of which balance belongs to the estate. The aggregate of all these amounts will reach less than $6,000.

Now, the guardian of Anna asks that she be allowed $5 a week for her care and maintenance since January 19th, 1892, and that this court shall decree that Emma Cordelia, as trustee of Anna's estate, shall hereafter pay the same sum per week, or

that the property of Anna shall be sold.    Five dollars a week
during the past period mentioned would amount to over $1,900.
If all of Anna's interest in the money now in court, namely,
$1,678.17, should be turned over to the guardian, it would not
pay this claim for past services, nor would it if the guardian is
charged with the balance in her hands, amounting to $191.50.
It would require a part of the small balance in the hands of the
trustee to liquidate this claim.    Any future allowance would
have to come out of the income of the principal of about $3,500
worth of real estate.    Indeed, the complainant claims that all
the estate left jointly to the sisters can be sold for this purpose.
This insistence is rested upon the notion that a one-half interest
was left Emma Cordelia in consideration for her care and main-
tenance of her sister, and so, inasmuch as Mrs. Moore has re-
lieved her of this care, Mrs. Moore is entitled to all the prop-
erty if she needs it for that purpose.    There is no doubt that
one reason, if not the principal reason, why the testator gave
one-half of the residue of his property to Emma Cordelia was
because he expected her to care for his imbecile daughter, but it
is transparent that she was to care for her under the roof which
he had provided for both of them.    That was the basic idea of
this provision.    The sisters were to live together after, as they
had lived before, his death.    Emma Cordelia was to take care
of Anna after his death in the same manner as she had before
his death.    To provide for their support while carrying out this
intention of the testator, he expressly gave them the residue
jointly, with the power conferred upon Emma Cordelia to sell
any or all of the property.    There is no doubt whatever that
the testator expected and wished that Anna should remain with
her sister, Emma Cordelia.

But the technical control over the person of Anna remained
in Mary E. Moore, the guardian appointed by the Gloucester
orphans court.    If Emma Cordelia had refused to keep her
sister there would have been good ground for insisting that a
trust was impressed upon the property given to her for the sup-
port of her sister, but upon what ground the share of Emma
Cordelia can be taken to support her sister, when she never

refused to support her, I fail to perceive. A view which possesses much more plausibility is that one-half of the property was given to Anna with the intention that it should be administered by Emma Cordelia in accordance with her discretion and upon the condition that Anna should live with her, and that, therefore, the property could only be utilized for Anna's benefit in the way intended by the testator. However, notwithstanding the testator created a trust in Emma Cordelia for the benefit of Anna Plummer, which she was to execute, this court will direct such parts of the trust funds as are essential for the support of the ward to be paid to the guardian. The control of a court of equity over trust funds under such circumstances depends upon the extent to which the property was devoted by the settler of the trust. The court will not take the *corpus* of the estate from the possession of the trustee (*Matter of Wilson 2 Pa. St. 325, 329*), unless it is apparent that the trust was created to last only until a committee should be appointed. *In re Earps' Estate, 2 Pars. Eq. Cas. 180.* A court has jurisdiction in equity to require the trustee of the property of a married woman who has become insane, the income of which is secured to her sole and separate use by a marriage settlement, to pay over to her husband, as guardian, such portion of the income as may be reasonable to aid in her support. *Davanport* v. *Davanport, 5 Allen 464.*

The trust, in the present instance, gave the trustee the power to devote not only the income of Anna's one-half interest but the power to sell the *corpus* of the one-half interest, if essential, for the support of the lunatic. A court of equity, therefore, has the power to direct, if necessary for the maintenance of the imbecile, that not only the income of the estate but a portion of the *corpus* should be devoted to that purpose.

The question then presented is what allowance should be made for the support of the *non compos?*

In fixing the amount, it must be kept in mind that the imbecile could have had a home with Emma Cordelia. It is apparent that if Anna had remained with Emma Cordelia, the income of the estate would have been amply sufficient for her support.

The accounts presented by Emma Cordelia show that, under her
careful management, the receipts from the property for five and
a half years was $3,396 in excess of payments for interest, taxes
and repairs.   Nor is there anything to show that Emma Cor-
delia was a cruel or incompetent keeper of her sister.   The
remarks attributed by Mrs. Moore to Anna, on the day the latter
left the house of Emma Cordelia, were not competent evidence.
The fact that no act of cruelty is proved, or that Mrs. Moore,
so far as appears, ever heard of any act of cruelty, goes far to
show that the father's confidence in Emma Cordelia was well
placed.   Now, it does not seem fair that Mrs. Moore should ask
from the estate of the imbecile a greater amount, as a considera-
tion for her own care, than she would have to pay to another
sister, who, so far as appears, would award her attention and
care quite as considerate and effective.   It is, however, said that
Emma Cordelia having a right by survivorship to the remainder
of Anna's estate, is, therefore, by reason of the temptation so
presented, rendered unfit to be the custodian over her sister.   It
is true, an old English rule discriminated against the heirs-at-
law or one next entitled to the lunatic's real estate after death,
as custodian of the lunatic.   But Lord Macclesfield, in *Neal's
Case, 2 P. Wms. 544,* refused to apply the rule to the next of
kin of a lunatic; and the same chancellor, in *Dormer's Case,
2 P. Wms. 262,* said that the maxim that the next of kin, to
whom the land cannot descend, is to be guardian in socage, is
not grounded upon reason, but prevailed in barbarous times
before the nation was civilized.   " It is shocking [he went on
to say] to think that any brother or uncle would do murder upon
his own brother or nephew to get his estate."   The old rule is
now disregarded in England as well as the United States.   On
the contrary, the law now supposes that " those standing nearest
to the lunatic by the ties of kindred will bring him more affec-
tion and patient fortitude than strangers in blood."   *Matter of
Livingstone, 1 Johns. Ch. 436; Ex parte Richards, 2 Brev. 375;
Matter of Colvin, 3 Md. Ch. 278, 285.*   A son, if no particu-
lar objection exists against him, will be appointed.   *Matter of
Bangor, 2 Moll. 518.*

Indeed, when the intention of the testator, who devised this property, and who had lived with both Anna and Emma Cordelia, is recalled, together with the fact that no act of cruelty or incompetence is proved against the latter, I think it would be a far-fetched conclusion to say that Anna would not be safe under the care of Emma Cordelia. Again, while the court has, I think, the power to compel a devotion of a part of the *corpus* of the estate of the imbecile to her support, if it is deemed essential, yet any present depletion of the *corpus* should be made with regard to her future support. She is only fifty-two years of age. Her estate should be so managed as to support her during her life. If the estate had not been depleted by the expenses of the litigation for the probate of James L. Plummer's will, and if the most lucrative property had not been sold away under foreclosure proceedings, induced by Mrs. Moore's advisers, the income would have been sufficient to keep Anna in the modest way in which she had always lived, and there would have been in the hands of Emma Cordelia, as trustee, after paying all the debts of her father's estate, from $2,000 to $2,500.

But the condition of the estate is unfortunately less prosperous, and the allowance must be made upon its present showing.

The guardian has been in the possession of property in which the imbecile has at least $1,000 interest. This has been worth to the guardian at least $1 a week. The total allowance of $3.50 a week is, in my judgment, under the circumstances, all that can be allowed. This would leave $2.50 a week additional to be paid since June 19th, 1892. That would amount to about $980.22. Mrs. Moore has in her hands $191.50 belonging to the estate of her ward. Deduct this from the amount due, it leaves $788.72. Emma Cordelia has in her hands as trustee a sum of $610.75, one-half of which belongs to the ward. She claims commissions on the sum of $1,814.61, the amount received by her as shown in her last account. In awarding her commissions it should be taken into account that the devise was made by her father of a joint interest in this property to her, coupled with the duty to care for her sister's share of the property. Keeping in view this consideration, two per cent. is a

sufficient allowance, which would amount to $36.30, or, more correctly, $18.15, commissions on Anna's share.   This would leave $287.22.   Applying this to the remainder of the amount due Mrs. Moore, it would leave $501.50 still due her.   She is entitled to be paid this amount out of the fund in the court of chancery.   The remainder of this fund will be directed to be paid to the trustee, to be by her invested.

. The matter of accounting by Emma Cordelia to her *cestui que trust* has been adjusted by agreement of the solicitors, and in respect to it the decree will be made conformably to such agreement.

I will advise no order in respect to future payment, but a right will be reserved to apply in this suit for future directions.