864 A.2d 437 (2005)
374 N.J. Super. 299
In the Matter of Rosa Cristina QUEIRO, an Incapacitated Person.
Superior Court of New Jersey, Appellate Division.
Argued November 30, 2004.
Decided January 14, 2005.
*438 Antonio R. Espinosa, Elizabeth, argued the cause for appellant Juan Queiro (Andril & Espinosa, attorneys; Mr. Espinosa, on the brief).
Edward J. Bowen, River Edge, argued the cause for respondents Isabel Barcelo and George Quintero.
No brief was filed by any other party.
Before Judges KESTIN, ALLEY and FUENTES.
The opinion of the court was delivered by
KESTIN, P.J.A.D.
Isabel Barcelo and George Quintero appear as petitioners in a verified complaint, originally filed on August 7, 2003, and amended shortly thereafter, seeking, pursuant to N.J.S.A. 3B:12-30, a judgment recognizing that Rosa Cristina Queiro (Cristina) continues to be an individual in need of a guardian over her person and confirming their appointment as testamentary guardians of Cristina;[1] and court approval, inter alia, of the Queiro Family Trust as part of a protective arrangement for the benefit of Cristina, pursuant to N.J.S.A. 3B:12-1 to -5.
An October 12, 2000 psychologist's report from Dr. Herman Huber, framed to aid in "assess[ing] the need for guardianship services[,]" noted that Cristina, at that time, was twenty-seven years of age. She suffered from spina bifida, had been diagnosed as hydrocephalic, and was in a wheelchair. According to the report, she was mildly retarded in terms of "intellectual functioning, below the 1st percentile[;]" had attained a fourth grade reading level; and, in behaviorial terms, functioned "adaptively ... at the level of a 6 year, 7 month old child." The evaluation acknowledged that the "latter score is somewhat depressed by her physical limitations." The report concluded:
Ms. Queiro is unable to independently shop, cook, travel, self-medicate, etc. She does have good knowledge of her personal demographics. At times she can be childish and paranoid and has an inordinate fear of strangers.
In my professional opinion, the evidence is clear and convincing that Ms. Queiro is appropriate for a limited guardianship. She lacks the cognitive capacity to make decisions, manage her affairs, and govern herself, in areas related to medical, legal, vocational, and residential issues and requires a guardian for these domains.
However, Ms. Queiro appears capable of serving as her own guardian in areas related to daily scheduling, leisure activities, etc.
The court-appointed psychologist in this matter, Dr. Joan Kakascik, noted that the Huber report had been "arranged through a [Division of Developmental Disabilities] program that a case manager would have described."
Josefina Queiro was Cristina's mother. In February 2002, the court had appointed her limited guardian of Cristina's person. Josefina died on July 22, 2003, when Cristina was twenty-nine years old. In her last will and testament, executed in 1995, Josefina had designated "[her] sister, Isabel Barcelo, together with [her] nephews, George Quintero and Michael Quintero,[2] jointly and severally, as co-guardians of *439 Cristina." At the same time, she established a special needs trust for the benefit of her daughter, see 42 U.S.C.A. § 1396p(d)(4)(A); N.J.S.A. 3B:12-1 to -5; N.J.A.C. 10:71-4.11(c), funded, inter alia, under the residuary provisions of the will.
Juan Queiro, the respondent in this matter, is Cristina's father. He and Josefina were divorced on June 30, 1989, when Cristina was fifteen years of age. The judgment of divorce granted custody over the child to Josefina. In 1991, Juan moved to Spain. He maintained telephone contact with Cristina and returned more or less annually for extended stays during which he would exercise visitation with his daughter frequently. Juan testified at the trial in this matter that he had had no knowledge of Josefina's petition for guardianship or the February 2002 judgment granting it. Along with his answer to the verified complaint in this matter, Juan Queiro, on August 29, 2003, filed a counterclaim seeking guardianship of his daughter, Cristina.
On October 3, 2003, the trial court appointed a guardian ad litem, who issued a written report dated October 28, 2003. Trial began on December 8, 2003. The court heard the testimony of Isabel Barcelo, George Quintero and Juan Queiro on that date. On the next trial date, December 10, 2003, the judge stated on the record that, after conversing informally with Cristina and reviewing the report of the guardian ad litem, he had determined to appoint an attorney to represent Cristina "so that her preferences, in addition to being told to me by Cristina, can be advocated by her attorney." The attorney had been appointed and was present in court on December 10. That attorney, in turn, at the court's behest, had recommended Dr. Kakascik as a psychologist the court could appoint to conduct an evaluation of Cristina and the parties' respective plans for her care, and render a report without undue delay. The trial judge also indicated that the court would furnish the attorney with a transcript of the proceedings to date, i.e., the testimony of the parties. The court then heard the testimony of a remaining fact witness, Juan Queiro's sister-in-law, in support of his position.
Dr. Kakascik rendered her report on December 22, 2003, and testified on January 7, 2004. Her evaluations are summarized in the following excerpts from her report:
1. What weight should be given to Ms. Queiro's preference for a guardian and a place of residence?
* * * Ms. Queiro appears to be reluctant to make a choice and to state her preference, relying instead on the judge to make the right decision for her. * * *
2. How reliable is Ms. Queiro's thinking?
I did not observe Ms. Queiro to display signs of thought disorder. * * *
3. What is Ms. Queiro's reasoning ability and decision-making ability?
... Ms. Queiro's abilities to reason and to make decisions may have been limited by confined life experiences and opportunities. * * * Ms. Queiro ... may have [been] overly protected.... * * *
It seems to me that Ms. Queiro has not had opportunities to make decisions about important matters in her life. She has been living a most dependent existence, although a loving one. She does not seem to have had enough demands placed on her that would engender growth towards independence.
4. Clarification of the adaptive level of 6 years, 7 months stated in the psychological report of 10/12/2000.
... Ms. Queiro could not have performed 17 of the 40 items [in the short *440 form test administered in connection with the 1990 evaluation] because of her physical limitations[.] * * *
I could not ascertain the basis of the age score because I did not have the raw score data from which the age range score would have been calculated. I suggest that the age-range score be interpreted as evidence that Ms. Queiro does not demonstrate adaptive abilities commensurate with her age. She has more life experience than a child of 6 years, 7 months and should not be considered as a child. The woman functions in the range of mild mental retardation. She cannot dress herself, bathe independently, wash her hair, or toilet herself because of her medical condition. These limitations are not related to her cognitive abilities of reasoning, thinking, and decision making. * * *
5. What additional services may Ms. Queiro require in a Plan of Care?
Both plans of care address Ms. Queiro's medical and financial needs. Each refers to her emotional vulnerability but provides no medical evidence of how the emotional vulnerability is manifested. Since she has mild mental retardation, it can be assumed that she could be more easily influenced and misled. If Ms. Queiro becomes "aggressive" at home, cabin fever should not be ruled out as a cause. Her fear of strangers may be related to her limited experience of the world. Ms. Queiro is not a diagnosis. She is a person. Her individual personal and social needs must be considered in addition to the medical and financial.
Neither plan of care addresses the young woman's social life or advocacy needs. Ms. Queiro is a pretty, charming young woman who has a social interest in others. She has no friends. She stays home most of the time except for family events. She does not work. The woman lives an isolated life. The plans of care must include resources that provide her a place to work and to socialize during the day and possibly social activities in the evening and on weekends. For example, she may be eligible for placement in a medical day care center where her physical limitations, medical needs and personal care are manageable. She could be with others and become involved in the varied programs (arts and crafts, parties, pre-vocational tasks). She should be evaluated by an equivalent of New Jersey's Division of Vocational Rehabilitation (DVR) to determine her work skills (manual or verbal).
Whoever is to care for Ms. Queiro in the future must be a person who can and will be an active advocate for her. Active advocacy means learning about the available state/community resources and programs as well as pursuing her enrollment in them. She must not be allowed to fall through the administrative cracks again. Active advocacy also means obtaining the right kind of assessments such as those performed by rehabilitation therapists, physical therapists and occupational therapists. An active advocate would locate the social programs available to persons with special needs such as those available through the ARC, Easter Seals and Cerebral Palsy Association.
Most importantly, Ms. Queiro's limited guardianship must be taken seriously by her guardian. [The October 2000 evaluation and report] recommended that Ms. Queiro could make decisions about her "daily scheduling, leisure activities, etc." How will her rights be preserved? It is likely that she is unaware of her rights. A future link to a Self-Advocacy Program (a national program with state affiliates) may help Ms. Queiro acquire skills of self-assertiveness *441 and responsibility. An interesting event occurred during the interview, which demonstrates a self-advocacy matter. I mentioned to Ms. Queiro that she could have money from her trust fund. With this money, she could plan a vacation to/from California or Spain, depending where she came to live. Ms. Queiro looked very surprised. Neither attorney had discussed the matter of the trust with her. (They were surprised at their own omission.) Money from her trust account certainly could be used for social activities such as vacations. Ms. Queiro should have the right and responsibility to participate in determining the use part of the money.
In her summary, Dr. Kakascik stated:
Ms. Rosa Cristina Queiro, age 30, faces a significant change in her life. The weight of the decision of with whom to live and where to live is a heavy burden. During the interview, Ms. Queiro said that she wanted "the judge" to decide for her. Clearly she is anxious. Ms. Queiro appears to have had very limited experience and opportunity to make decisions in the more significant areas of life. What she faces now would be daunting for many people. Although she has lived with a loving, caring and protective family, her life may have been inadvertently overly protected.
The prospective guardians each have developed plans of care primarily concerned with her medical needs and her financial resources. Both are very significant matters. Neither plan discusses her social needs or advocacy for a life more involved with peers and the wider community. Neither plan addresses how to implement the areas of responsibility left to her through the determination of limited guardianship.
Also on January 7, 2004, after hearing Dr. Kakascik's testimony, the judge interviewed Cristina in chambers. Following the interview, he reported on the record that she had "reiterated the desire that [the court] make the decision and really expressed no preference," and he stated his intention to make a speedy decision in the matter.
The decision was rendered orally on January 16, via a telephone conference call, with Juan Queiro's counsel physically present. After covering the procedural history of the matter and analyzing and evaluating the proofs, the trial judge concluded, based upon the facts as he found them and the governing standards of law as he understood them, that judgment would be entered "appoint [ing] the testamentary guardians as successor guardians" for Cristina, and providing for reasonable and liberal visitation with her father in Spain, or in California, where she would be residing with the guardians. On February 5, 2004, the judge entered a comprehensive order embodying those mandates and containing considerable detail under the following headings:
. Medical Findings of Fact
. Findings of Fact Relating to Skills and Abilities
. Findings as to the Need for Limited Guardianship
. Specific Responsibilities of a Limited Guardian
. General Responsibilities of a Limited Guardian
. Findings Relating to Income and Assets
. Findings as to Fitness of Guardians
. Appointment of Successor Limited Guardian
. Statutory Duties, Powers and Rights of Guardian
In his decision, the trial judge covered the procedural history of the matter and *442 posited N.J.S.A. 3B:12-30 and -31 as the statutory bases for this guardianship proceeding. N.J.S.A. 3B:12-30 provides for the appointment of a testamentary guardian of a mentally incapacitated adult in the following terms:
The parents of an unmarried mental incompetent or the spouse of a mental incompetent may by will appoint a testamentary guardian of the person, or a guardian of the estate, or of both the person and estate of the mental incompetent. Before the appointment of a testamentary guardian becomes effective, the person designated as the testamentary guardian shall apply to the court in a summary manner, upon notice to the mental incompetent, any guardian who may have been appointed for him, to the person or institution having his care and to his heirs as the court may direct, for a judgment confirming his appointment under the will.
N.J.S.A. 3B:12-31 governs a situation such as the instant matter where "the other parent survives the appointing parent," requiring the consent of the surviving parent to the appointment.
The judge then referred to N.J.S.A. 9:2-5, as "speak[ing] to the procedure that the court is to employ when there is a death of a parent who has custody of an individual[.]" He cited In re Guardianship of Hoppe, 32 N.J.Super. 460, 108 A.2d 664 (Cty.Ct.1954), as establishing the court's authority to deal with the question, and stated that Watkins v. Nelson, 163 N.J. 235, 748 A.2d 558 (2000), controlled in its holding,
among other things, that upon death of the custodial parent, a presumption exists in favor of the surviving biological parent in an action for guardianship, and that court cites 9:2-5....
The court in Watkins goes on to say that the presumption in favor of the surviving biological parent can be rebutted by proof of gross misconduct, abandonment, unfitness or the existence of exceptional circumstances. The presumption can never be rebutted by a simple application of the best interests test, citing 9:2-4 and 9:2-5.
What the court in Watkins indicates ..., is that there is a two-step analysis that the court must undergo. The first step requires application really of the parental termination standard or a finding of exceptional circumstances, and if that standard is met or satisfied, the second step requires the court to decide whether awarding custody or guardianship in this case to the third party would promote the best interests of the child.
So, it is against that legal backdrop that the court must analyze the facts that are before it.
After reviewing the evidence in light of the principle articulated in Watkins, supra, 163 N.J. at 246, 748 A.2d 558, "that a showing of gross misconduct, unfitness, neglect, or `exceptional circumstances' affecting the welfare of the child will overcome [the] presumption [of custody that exists in favor of a parent, and] is a recognition that a parent's right to custody is not absolute[,]" the trial judge determined that the presumption in favor of Mr. Queiro had been overcome by clear and convincing evidence. The judge found Mr. Queiro had
through his actions, ... show[n] a basic lack of common sense in dealing with someone like [Cristina] and her condition. He is unaware of the medication she was taking, he is unaware of what other doctors she might need other than a urologist and a gynecologist, he was unaware that [Cristina] may not even be able to relate to him when asked what medications she had been taking, and ... this is a young woman who suffers *443 from spina bifida and other illnesses that are going to require significant medical treatment for the rest of her life....
This court believes that the testimony of Mr. Queiro, when he was consistently nonresponsive to the court ... [as] this court painstakingly in question after question would ask Mr. Queiro about either how he would get to the hospital, who he would call and how he would call, and Mr. Queiro for whatever reason was, quite honestly, unable or unwilling to answer the questions.
So, when the court takes the most recent incident and juxtapositions it on the earlier incident, and in conjunction with the questions that the court asked regarding his reaction if something were to happen to [Cristina] it leads this court to find by clear and convincing evidence that the standard as articulated by Justice Coleman in the Watkins case, the first prong of it has been overcome, or has been satisfied, I should say, so that the presumption no longer exists.
The judge then went on to analyze the proofs in the context of Cristina's best interests, assessing the care, concern, and capabilities of all involved, and concluding that "both sides here present care plans which are generally acceptable." The judge continued:
But at the end of the day, I am satisfied, based upon the testimony that I have already referred to, and the person that impresses me the most, [George Quintero,] that who I think it would be in the best interests of Cristina to be with are the testamentary guardians. This is a very difficult decision for the court, very difficult. And I say that because I think the plan of care, although certainly is specific from Mr. Queiro's point of view, that the support staff, so to speak, that Ms. Barcelo has with her son George, with his two children, with his wife, and what George is willing to do for Cristina and open her up to things that she is more than ready to see, and from the testimony that I had the opportunity to observe with his willingness and his dedication to this young woman, I am satisfied that although the care plans are more or less the same, I do believe that the availability of medical facilities, the aforementioned hospitals to which I referred, may be more plentiful in California, and the reason is the support staff that exists in California in the nature of George and his family and his willingness to take over if for some reason Ms. Barcelo is unable to take over.
That concept of opening her up and making her more independent is something Dr. Huber talked about, Dr. Kakascik talked about and George Quintero talked about and it must be done. With this child, as tempting as it is to shelter her from the outside world because of her condition, that is not the best thing and it is not in her best interests. She is a bright young woman who happens to suffer from spina bifida and the attendant effects that has, but she is capable of leading a full life, to the best of her ability, and that needs to be done.
So, for those reasons, then, I will enter a judgment that appoints the testamentary guardians as successor guardians for [Cristina].
We hasten to express our admiration for the well-considered, expedited procedures crafted by the trial judge; the great sensitivity he brought to the issues before him and the interests of the parties; and the meticulous attention to detail that guided his handling of the matter from the outset to conclusion. We are, nevertheless, constrained to reverse and remand for reconsideration. We have no difficulty in affording great deference to the trial court's *444 findings, all of which were supported by adequate, substantial, credible evidence. See Cesare v. Cesare, 154 N.J. 394, 411-12, 713 A.2d 390 (1998); Pascale v. Pascale, 113 N.J. 20, 33, 549 A.2d 782 (1988). We discern, however, that incorrect legal standards were applied to reach the decision, requiring a reconsideration of the matter in the light of the correct principles. Although neither brief on appeal alluded to this flaw, when confronted with it on oral argument, the parties could only acknowledge the defect.
We also commend all others involved in the case, as the trial judge did. As far as we are able to discern from the record, the contending parties and their attorneys were, at all times, constructively engaged in the matter and committed to promoting Cristina's best interests. Those appointed by the court  the guardian ad litem, the attorney for Cristina, and the psychologist  all functioned with an admirable devotion to professional and public duty.
There is nothing in the statutory scheme that suggests the surviving parent enjoys a preference for appointment as testamentary guardian of an incapacitated adult, as is the case regarding custody and guardianship over a minor child, see Watkins v. Nelson, 163 N.J. 235, 748 A.2d 558 (2000). Nevertheless, N.J.S.A. 3B:12-31 requires the consent of the surviving parent. When that consent is withheld, the dispute must be decided by a court applying the appropriate standards. The question before us in this matter is what the prevailing criteria are, i.e., whether there are any beyond those prescribed by the literal terms of the statute.
Manifestly, the trial court erred in applying the standards that have developed under Title 9 of the New Jersey statutes, particularly N.J.S.A. 9:2-5, dealing with the death of the parent having custody of a minor child and the rights of the surviving parent. On its face, all of Title 9 deals with minor children. Title 3B deals with the administration of decedents' estates and the estates of others. Both Title 9 and the guardianship provisions of Title 3B regarding incapacitated adults evoke the State's parens patriae authority and interests; but, that is where the similarity of design ends.
Watkins and Hoppe both dealt with situations involving minor children. None of the standards developed under Title 9 or articulated in those cases have any direct bearing on the issues in the matter at hand.
The trial court correctly identified the "two-step analysis that the court must undergo," according to Watkins, supra, 163 N.J. at 253-55, 748 A.2d 558, in a situation involving a minor child, as follows:
The first step requires application really of the parental termination standard or a finding of exceptional circumstances, and if that standard is met or satisfied, the second step requires the court to decide whether awarding custody or guardianship in this case to the third party would promote the best interests of the child.
But, this case does not involve guardianship over a minor child, and there is no basis beyond Watkins and the statutes it addressed for requiring the two-step analysis here. We hold, therefore, that the two-step analysis is inapposite in a case of this type. There are no grounds for applying parental termination standards or their surrogate, exceptional circumstances, to a case involving guardianship over an incapacitated adult. Yet, the "best interests" criterion seems portable and appropriate.
The jurisprudential sources in this State that illuminate the standards to be applied in a dispute arising from the operation of *445 N.J.S.A. 3B:12-30 and -31 are scant and conflicting. One such source is found in a phrase in N.J.S.A. 3B:12-34 that refers to the court's responsibility in making "any order touching the testamentary guardianship" to evaluate and promote "the best interest and welfare of the mental incompetent."
Another nominally cognate provision, in N.J.S.A. 3B:12-25, enacted in 1981, dealing with the appointment of a guardian other than a testamentary guardian, creates a preference for the disabled person's spouse, if both were living together when the incompetency arose, or to the disabled person's heirs. That provision contains a default standard permitting the appointment of "any other proper person," if it is established that the appointment of the spouse or heirs will not serve "the best interest of the incompetent of his estate." We opined in In re Roll, 117 N.J.Super. 122, 283 A.2d 764 (App.Div.1971), dealing with a predecessor provision, N.J.S.A. 3A:6-36, of like purport, that
the statute (and rule)[3] gives a preference to the next of kin as against other persons and that such preference must be recognized unless it is shown to the court's satisfaction that the appointment of next-of-kin would be affirmatively contrary to the best interests of the incompetent or his estate in the sense of being deleterious thereto in some significant way. The statute does not mean that of two entirely fit persons, one a next-of-kin and the other not, the court may indulge in a weighing contest as to whose appointment would better serve the interests of the incompetent or his estate. It would appear that the present framework of statute and rule was designed to eliminate the former practice under which the court commonly appointed a friend of the court.
[Roll, supra, 117 N.J.Super. at 124, 283 A.2d 764.]
See also Plummer v. Gibson, 59 N.J. Eq. 68, 73, 45 A. 284 (Ch.1900)(referring to the general rule preferring next of kin, in a case involving a testamentary trust and a non-testamentary guardianship where the contestants were kin of equal degree). On the other hand, In re McAdams, 89 N.J. Eq. 159, 104 A. 201 (Prerog.Ct.), aff'd o.b., 89 N.J. Eq. 237, 107 A. 895 (E. & A.1918), involved a non-testamentary guardianship in respect of which the dispute between relatives was over whether a particular non-relative should be continued as guardian. The court, in dictum, distinguished guardianships for minor children from those for adults, id. at 161, 104 A. 201, observing "that the only qualification here required is the appointment of a fit and discreet person." Id. at 162, 104 A. 201.
There is no uniformity among the states on the question, either. Differences of judicial approach and result, as well as statutory variations, have led to disparate out-of-state legal developments in the subject matter area. See Peter G. Guthrie, Annotation, Priority and Preference in Appointment of Conservator or Guardian for an Incompetent, 65 A.L.R.3d (1975).
The facial characteristics of our statutory scheme strongly suggest that the Legislature intended the standards for appointment of a testamentary guardian, see N.J.S.A. 3B:12-30 to -35, to be distinct from those governing appointment of a non-testamentary guardian, see N.J.S.A. 3B:12-25. Were it otherwise, the statutory provisions would not be separate and the criteria so differently articulated. Although, in Roll, we construed the language of N.J.S.A. 3B:12-25 to embody a kinship-hierarchy preference with regard *446 to non-testamentary guardians, no such intendment can be divined from the provisions governing testamentary guardians. We must take as definitive the only legislatively stated preference, "the best interest and welfare of the mental incompetent," which is to be applied giving due regard to the testator's expressed design. See N.J.S.A. 3B:12-30, -34.
It is not difficult to discern, within the four corners of the trial court's oral disposition, a basis for concluding that the determination in favor of petitioners was grounded upon findings and conclusions that that result would serve Cristina's best interests and welfare, thus satisfying the criteria of N.J.S.A. 3B:12-30 to -35. As we have concluded, the court's evaluative choices regarding the parties' respective care plans and their capacities to serve are entitled to deference because they are based on findings supported by substantial, credible evidence. We might well adopt, as dispositive, the best interests finding that the trial judge made. Yet, however correct that aspect of the trial court's opinion might be, it is not fitting that we should affirm a result based upon an incorrect view of the governing legal standards. It is more appropriate for the trial court to reconsider the matter, determining the result in the first instance based upon a correct view of the governing legal standards after the parties have been given sufficient opportunity to address the issues in the light of those norms.
Reversed and remanded.
NOTES
[1] For the sake of clarity, intending no disrespect, we will sometimes refer by their preferred or first names to the three individuals with the last name Queiro.
[2] Michael Quintero died in May, 2003.
[3] Now R. 4:86-6(c).